# CHARLESTON.

NORFOLK & WESTERN RAILWAY COMPANY v. THE PUBLIC
SERVICE COMMISSION.

## Submitted April 24, 1918. Decided May 7, 1918.

1. COMMERCE—*Facilities to Shipper—Interstate Commerce Act.*
    The Act of Congress to regulate commerce, as amended, confer-
    ring upon the Interstate Commerce Commission authority to com-
    pel railroads engaged in interstate commerce to provide shipping
    facilities for shippers tendering interstate shipments sufficient to
    justify the construction and maintenance of the same, does not
    deprive the Public Service Commission of jurisdiction to require
    such a railroad to provide such facilities to a shipper offering
    intrastate commerce in such quantities as warrants the installation
    of the facilities demanded, even though such facilities, when pro-
    vided, may be used in the shipment of interstate as well as in-
    trastate commerce. (p. 413).

2. PUBLIC SERVICE COMMISSION—*Findings of Fact—Review.*
    Findings of fact by the Public Service Commission based upon
    evidence to support them will not be reviewed by this Court.
    (p. 412).

3. CARRIERS—*Failure to Furnish Shipping Facilities—Excuse.*
    A common carrier will not be excused from its duty of furnish-
    ing shipping facilities to one offering commerce to it, upon the
    ground that all of its energies are required to meet government
    needs, brought about by the present state of war, where it does not
    appear that the granting of such facilities would divert any of the
    carrier's energies, or require of it service which would make it
    less than to perform its public duty. (p. 418).

Petition by the Norfolk & Western Railway Company for
suspension of an order of the Public Service Commission re-
quiring petitioner to furnish shipping facilities to the Trace
Coal Company for coal mined on its lands.

                    *Order of suspension refused.*

*Holt, Duncan & Holt,* for petitioner.

*S. B. Avis,* and *Meek & Renshaw,* for respondent.

RITZ, JUDGE:

The Trace Coal Company made application to the Public
Service Commission to compel the Norfolk & Western Rail-

way Company to furnish it shipping facilities for coal mined at its plant in Wayne county.  Upon a hearing the commission entered an order requiring the railway company to make its election, within thirty days, of one of three things which would furnish the facilities desired, and to thereafter permit the complainant to furnish the material and labor required to provide that one of the facilities so selected by the said railway company.  The railway company procured a suspension of this order from this court and seeks to have the same set aside.

It appears that a number of years ago, for the purpose of furnishing facilities for the shipping of coal from several mines, the railway company constructed a spur off its main line at Dingess.  This branch was something like a mile in length, and upon it were several small coal operations.  After operating a few years these operations, about the year 1908, ceased to do business, the situation being such that they were unable to operate their mines profitably.  From that time until quite recently no use had been made of this branch by the railway company, or by any one else, and it was allowed to fall into an unusable condition.  A short time since a lumber company established quite a large mill on this branch line at a point some 2000 feet from its connection with the main line of the railway company.  In order to furnish service for this lumber company the branch was rehabilitated and repaired up to the lumber company's plant, and is now being used to that point for the purpose of serving said lumber company.  The Trace Company acquired a lease on a tract of land which had theretofore been operated by one of the companies that had gone out of business in 1908, and desired to commence shipping coal from this property.  In fact, it has been mining and shipping some coal by hauling the same to the station at Dingess and loading it in cars at that point.  This necessitates, however, a haulage of something more than a mile in wagons from the mouth of the mine to the place of loading and, of course, makes it very expensive for the company to market its product.  It appears that it has a tipple at its mine, and it desires this track rehabilitated from the lumber company's plant up to its mine, a distance of some two

thousand feet, and a siding put in, so that it might load coal from its tipple; or that the siding used by the lumber company be extended and it allowed to use the old main line track of the branch to haul coal to the lumber company siding, and there load it into the cars; or else that it be allowed to rehabilitate the main line of the branch and load the cars standing on such main line at its mine. The railway company declined to accede to any of these requests, and refused to allow the Trace Company to provide any facilities for the loading of its coal other than hauling it to its station at Dingess and loading it in cars at that point. The proposal of the Trace Company is to furnish all of the material and do all of the work at its own expense, in such manner as the railway company desires that it be done, and the commission's order gave the railway company the privilege of choosing which of the three facilities it would prefer, and after such selection made by it, that it allow the Trace Company to provide the facility so selected, to the end that it might load its coal and ship the same without being subjected to the disadvantage of hauling it a long distance from the mouth of its mine to the siding at Dingess station.

The first contention of the railway company is that the Trace Company's freight is not sufficient to justify the expense of the improvement. A large amount of the testimony is directed to this proposition. The railway company contends that the coal in the mine of the Trace Company is of such character that it will be impossible for the Trace Company to mine it and ship it at a profit, and that it will only be a short time until the mine will have to close down. On the other hand, the Trace Company shows that this coal is about thirty-six inches in thickness, and that it has mined and shipped two car loads thereof at a profit, after being subjected to the expense of hauling it in wagons for a distance of more than a mile. It says further that this is not a question that need concern the railway company, inasmuch as it proposes to bear all of the expense of the improvements desired, and whether it can make a profit or not, or whether it closes down in a short time or not, can in no wise affect the railway company, for if it continues to operate and furnish

the railway company the freights, it will receive its charges for hauling the same, whether they are produced by the Trace Company at a profit or at a loss, and should the Trace Company go out of business the railway company will be left with its facilities, so far as the tracks are concerned, in better conditon than they are at present. The railway company argues, and there is some testimony to the effect, that the rails on this branch would have to be taken up, and rails of heavier weight substituted therefor, in order to accommodate its equipment. If this were true it would still place no burden upon the railway company. But there is a report filed in this case by the Public Service Commission's inspector, who went upon the ground, and in that report it is shown that the rails which the railway company is now using in the main line of this branch up to the Hutchinson Lumber Company's plant are of the same size as the rails between that plant and the mines of the defendant, so that it is a little hard for us to conceive why the railway company's equipment would require heavier rails between the lumber company's plant and the mines than it does between its main line and the lumber company's plant. The evidence offered by the Trace Company shows that it has a capacity now to produce one car load of coal a day, and if it is permitted to have these facilities in a very short time it can and will increase this output to five cars a day. It also shows that it can mine this coal at a reasonable profit at the present price, and can even make a reasonable profit thereon when the prices are much less than they are at present if it can avoid the necessity of hauling its product to the railway line in wagons. The railway company argues that to require it to give the facilities asked would be a taking of its property, and that before this can be done it must be shown that there is a necessity therefor. It is quite true that where a railway company is required to expend money in furnishing facilities to a shipper, there must be a showing that there is reasonable necessity therefor, and that the returns received by the railway company will be commensurate with the expenditures it is compelled to make. The application of this argument to the case here is a little difficult, however, in view of the fact that the railway com-

pany is required to make no initial outlay whatever. It is true the furnishing of these facilities contemplates that cars will be furnished for the shipment of the coal, but only such cars will have to be furnished as freights are furnished for, and the freight charges made by the railway company is the compensation for the use of its cars for this purpose. Its freight rates are so adjusted as to compensate it for the work it does in placing cars, and in removing them from the place where they are loaded to the point of destination. It is, therefore, quite clear that however many cars the railway company is required to furnish for the shipment of this coal, it is in a position to demand and receive full compensation for that service at the time it is required to perform it. There is abundant evidence to justify the finding of the commission that the freight offered of an intrastate character warrants furnishing the facilities desired, and we will not override the commission's findings of fact where there is evidence upon which to base them. There is, therefore, no merit in the contention that any of the railway company's property will be taken for the purpose of making these facilities without just compensation therefor.

It is contended that the evidence offered does not justify the commission's conclusion that commerce of an intrastate character is at all involved. It is shown that the intention is to ship the product of this mine to Williamson, West Virginia, Huntington, West Virginia, and to various cities in Ohio. The shipments to Williamson, West Virginia, would be for reshipment to other points, and it is contended that there is no real purpose to make shipments to Huntington, West Virginia, which would be intrastate commerce, because of the fact that natural gas is largely used in that city. We know judicially that Huntington is a city of considerable size, rivalling in manufacturing and commercial importance any city of the state, and we do not think the testimony is unreasonable that a considerable part of the product of this mine would be used for commercial and manufacturing purposes in that city. There is evidence upon which the commission could base this finding, and this being true, we will not review the same.

The railway company further contends that the Congress of the United States has assumed exclusive jurisdiction over the matter of constructing sidings on railroads engaged in interstate commerce, and that it having done so, neither the State of West Virginia, nor any agency created by it, has any power or authority to compel or require such a railway company as the petitioner to furnish any siding facilities to any shipper for any purpose whatsoever. Its contention is that even though these sidings may be desired for intrastate shipments exclusively, inasmuch as the said railroad is engaged in interstate commerce the jurisdiction in the Interstate Commerce Commission is exclusive. If the Act of Cngress to regulate commerce is susceptible of any such construction, it may be doubted whether Congress has power to accomplish such purpose. If the contention of the railway company is sustained that the Congress of the United States has power to deprive the states of any control over a carrier engaged in interstate commerce, then the power of the states to in any way interfere with or control the actions of the railroads of this country is gone . It must be remembered that these rail- roads are within the states and operate therein by virtue of authority granted to them by the states. They are granted the sovereign right of eminent domain, and in exchange for this right the states have always been conceded certain regu- latory powers over the carrier. If it can be said that Con- gress has the power to appropriate to itself the exclusive con- trol of such carriers as are engaged in interstate commerce, then the state's right of eminent domain is taken away from it, and is enjoyed by the railroads without any correspond- ing obligation or duty upon their part. The exigencies of trade and business would create anomalous situations. It is not an unusual thing for a siding to be desired by some in- dustry for purely intrastate shipments, and under the con- tention of the railway company such a shipper would be en- tirely without a remedy. The state commission would have no authority to compel the railway company to furnish facili- ties, and the Interstate Commerce Commission would have no authority, because there would be no question of interstate commerce involved. Congress never intended to create such

a condition as this. When section one of the Act of Congress to regulate commerce, as amended, is read together it seems quite clear to us that what Congress intended to do was to assume control over interstate commerce and every agency connected therewith. Nowhere in this act do we find anything which justifies the assumption that the Interstate Commerce Commission alone has the right to compel the furnishing of facilities for a shipper, unless the shipments offered are of an interstate character. The railway company relies upon the holdings of the Supreme Court of the United States in construing the Safety Appliance Act, the Hours of Service Act, and in the Shreveport rate case as justifying its contention. In passing upon the applicability of the Safety Appliance Act to the instrumentalities used by an interstate railway company in intrastate commerce, the court held in *Southern Railway Co.* v. *United States,* 222 U. S. 20, that the clear language of the act included every instrumentality used by such a railway. The language of that act itself includes all of the cars, engines and other instrumentalities used by a railway engaged in interstate commerce, and the court held that it mattered not whether these instrumentalities were being used in interstate commerce, or exclusively in intrastate commerce, they were included within the language of the Act. The court upheld the Act as constitutional upon the ground that it was necessary to include these agencies used in intrastate commerce in order that the beneficent results sought might be attained. If a railway company was required to equip only such cars as were used in interstate commerce with safety appliances, and might use cars for intrastate commerce not so equipped, the danger to interstate employes and travellers might be, to some extent, decreased, but the object of the act would not be fully accomplished and the constitutionality of that Act is upheld upon that ground alone. Mr. Justice Van Devanter, speaking for the court in upholding the Act upon this ground, at page 26 of the opinion says: ''We come then to the question whether these acts are within the power of Congress under the commerce clause of the Constitution, considering that they are not confined to vehicles used in moving interstate traffic, but embrace ve-

hicles used in moving intrastate traffic. The answer to this question depends upon another, which is. Is there a real or substantial relation or connection between what is required by these acts in respect of vehicles used in moving intrastate traffic and the object which the acts obviously are designed to attain, namely, the safety of interstate commerce and of those who are employed in its movement? Or, stating it in another way. Is there such a close or direct relation or connection between the two classes of traffic, when moving over the same railroad, as to make it certain that the safety of the interstate traffic and of those who are employed in its movement will be promoted in a real or substantial sense by applying the requirements of these acts to vehicles used in moving the traffic which is intrastate as well as to those used in moving that which is interstate? If the answer to this question, as doubly stated, be in the affirmative, then the principal question must be answered in the same way. And this is so, not because Congress possesses any power to regulate intrastate commerce as such, but because its power to regulate interstate commerce is plenary and competently may be exerted to secure the safety of the persons and property transported therein and of those who are employed in such transportation, no matter what may be the source of the dangers which threaten it. That is to say, it is no objection to such an exertion of this power that the dangers intended to be avoided arise, in whole or in part, out of matters connected with intrastate commerce.

Speaking only of railroads which are highways of both interstate and intrastate commerce, these things are of common knowledge. ''Both classes of traffic are at times carried in the same car and when this is not the case the cars in which they are carried are frequently commingled in the same train and in the switching and other movements at terminals. Cars are seldom set apart for exclusive use in moving either class of traffic, but generally are used interchangeably in moving both; and the situation is much the same with trainmen, switchmen and like employes, for they usually, if not necessarily, have to do with both classes of traffic. Besides, the several trains on the same railroad are

not independent in point of movement and safety, but are interdependent, for whatever brings delay or disaster to one, or results in disabling one of its operatives, is calculated to impede the progress and imperil the safety of other trains. And so the absence of appropriate safety appliances from any part of any train is a menace not only to that train but to others.''

In the case of *Northern Pacific Railway Company* v. *Washington*, 222 U. S. 370, it was held that Congress had entered upon the field of prescribing hours of service for railroad employes engaged in interstate commerce, and that having done so its jurisdiction in that regard was exclusive. It was further held that an employe engaged in train service upon a train carrying both classes of commerce was engaged in interstate commerce, and the Hours of Service Act of Congress applied to him. This decision has no application to this case.

In the Shreveport rate case, 234 U. S. 342, the court justified the interference of the Interstate Commerce Commission with intrastate rates, not upon the ground that Congress under the commerce clause of the Constitution had power to prescribe regulations for intrastate commerce as such, but upon the sole ground that the regulations prescribed by the state for handling intrastate commerce operated so as to cast a burden upon interstate commerce. The whole contention in that case was based upon an attempt of the state of Texas to build up the trade of a competing Texas city at the expense of the City of Shreveport. Such rates were prescribed for the intrastate shipments to the Texas city as made it necessary for the railroad company to require much higher rates for interstate shipments than it was allowed by the order of the Texas Commission to charge for the intrastate shipments, and interference with the intrastate rate was based solely upon the ground that by prescribing this low rate for intrastate shipments an undue burden was placed upon the interstate commerce carried by the railroad. It will thus be observed that in these instances the interference of Congress with intrastate commerce is justified, not upon the ground that any power is possessed by Congress to regulate such commerce, but solely for the reason that the proper regulation

of interstate commerce required such incidental interference. No such condition exists in this case. The furnishing of these facilities can in no way affect interstate commerce or any regulation thereof, and the only reason for the assumption of the power upon the part of Congress to regulate intrastate commerce is lacking.

The contention here relied upon by the railway company was made in the case of *Washington & Old Dominion Railway Company* v. *Royster Guano Co.* (Va.) 94 S. E. 763, and that court in upholding the order of the Corporation Commission of Virginia, requiring the carrier to furnish siding facilities for shipments in intrastate commerce, held that the fact that interstate shipments might also be made over the same siding did not deprive the Corporation commission of its jurisdiction to require the facilities for the intrastate shipments. In the case of *Jacobson* v. *Wisconsin M. & P. R. Co.* (Minn.) 74 N. W. 893, the Minnesota Supreme Court upheld an order of the Public Service Commission of that state requiring such facilities to be furnished for intrastate commerce, notwithstanding interstate shipments might incidentally be involved. The court in that case also held that in determining the question of whether the freight offered would give an adequate return to the carrier for the expenditure it was required to make in furnishing the facilities, the commission might consider not only the intrastate shipments which were offered, but also the interstate shipments, and if all of the shipments which would be offered at the siding, both intrastate and interstate, were sufficient in amount to warrant the expense, the order would be upheld. This conclusion would seem to be justified upon the ground of common sense, for if the state commission, in determining the question of the sufficiency of the freight offered to justify the expense, could only consider the intrastate shipments which might be offered, it might be found that they alone would be insufficient for the purpose; and likewise, in the same case, the Interstate Commerce Commission might find that the interstate shipments would be insufficient to warrant the expense, while consolidating both characters of commerce there would be ample freight to justify requiring the carrier

to furnish the facilities. This would present a case where a shipper had ample commerce to justify giving him the facilities he desired, but he would be unable to get them because he had not sufficient of either class of such commerce. The decision of the Minnesota Supreme Court above referred to was affirmed by the Supreme Court of the United States in the case of *Wisconsin M. & P. Railway Co.* v. *Jacobson.* 179 U. S. 287. In the case of *Chicago R. I. & P. Railway Co.* v. *State* (Okla.) 157 Pac. 1039, the same question was before the Oklahoma Supreme Court, and that court overruled the contention made by the railway company that, it being an interstate highway, Congress had exclusive jurisdiction over the matter of providing switch connections. We are of opinion that where a shipper has commerce of an intrastate character to offer to a carrier warranting the construction for him of switch connections, the Public Service Commission has jurisdiction to compel the carrier to grant such switch connections, notwithstanding the siding, after it is constructed, may also be used for the purpose of making interstate shipments. No doubt, under the Act of Congress, the Interstate Commerce Commission would have jurisdiction to compel the granting of such facilities because of the interstate commerce offered, but this fact does not deprive the state of its right to see that shippers with freight of an intrastate character are given the facilities to which they are entitled.

The argument is further made by the railway company that at this time its energies are fully required to meet the extraordinary demands made upon it because of the present state of war; that all of its resources in the way of steel rails, ties and switches are needed for this purpose, and that it should not be required to furnish facilities to any shipper other than those already having such facilities, for the reason that to do so might require of it additional equipment, or additional work for its trains or crews without producing any additional freight. As before stated, the granting of the facilities asked for here does not make any requisition upon the material resources of the railway company. It does not require the expenditure of one cent by it, and it does not show how the granting of the facilities asked for this shipper would in-

crease its work so as to embarrass it in complying with its public duty. In the absence of such a showing we would not be justified in saying that this shipper should not be granted the facilities enjoyed by other shippers of coal. If it should turn out, in the operation of this switch connection for the business of the Trace Company, that an undue burden is imposed upon the railway company, and that its operations are crippled, and it is hindered and delayed in performing its paramount duty to the Government, upon representation of such condition to the Director General of Railroads, he has ample power to give the railway company relief, and we do not doubt that upon a showing of that character being made such relief will be promptly afforded.

We find no reason for disturbing the order of the Public Service Commission made in this case.

*Order of suspension refused.*