ST. LOUIS-SAN FRANCISCO RY. CO.
v. STATE (two cases).

Nos. 34356, 34357.   Nov. 21, 1950.

Rehearing Denied May 1, 1951.

*230 P. 2d 709.*

E. G. Nahler, St. Louis, Mo., and Satterfield, Franklin & Harmon, Oklahoma City, for plaintiff in error.

James G. Welch, Choice D. Holden, and D. C. McCurtain, Oklahoma City, for Corporation Commission.

Paul Harkey, Idabel, and James G. Welch, Oklahoma City, for protestants and intervener.

GIBSON, J. These are separate appeals from orders of the Corporation Commission in each of which appellant was denied permission to discontinue the operation of its passenger trains on a branch of its system in Oklahoma. The appeals are consolidated for the purpose of review.

In case 34356 there was sought to discontinue trains 609 and 610 operating between Enid, Oklahoma, and the Oklahoma-Texas line, south of Frederick, Oklahoma, and in cause 34357 trains 773 and 774 between Hugo, Oklahoma, and the Oklahoma-Arkansas line east of Bokhoma, Oklahoma.

The grounds alleged for the permission to discontinue are that public necessity and convenience no longer require the continued operation of said trains at a tremendous deficit to the railway company, which condition has obtained for a long period and will continue. It is further represented that if

the authority be granted the towns presently served by said trains will be served by mixed trains on an indicated time schedule.

In each case the commission found, in substance, as follows: That the railway by virtue of its charter and franchise was under an absolute duty to furnish adequate and reasonable passenger service and that the obligation could be avoided only by a showing that the rendition thereof is an undue burden upon the entire system. That the only passenger service being rendered was that afforded by the trains sought to be discontinued and that there was no showing that the operation of the branch, including both freight and passenger service or the operation of the entire system, was unprofitable. And, that the mixed train service proposed would not afford reasonable and adequate service.

The company charges in each case that the evidence does not sustain the findings nor the findings the order, and that such order would deprive the company of its property without due process of law and, further, would constitute an unauthorized burden upon interstate commerce.

There is no dispute as to the salient facts.

The extent of the Enid line in Oklahoma is approximately 191 miles, and that of the Hugo line approximately 60 miles. The only passenger service being rendered on the lines is that of trains 609 and 610 on the Enid line and trains 773 and 774 on the Hugo line. The train equipment is known as electric motor car with passenger compartment attached as a trailer, such car being a combined passenger, mail, baggage and express car.

The trains on each line have, for a number of years, been operated at a deficit, which has greatly increased during the recent years by reason of a rapid decline in public patronage. The direct or out of pocket cost (which does not include taxes, depreciation of rolling stock, administration expenses and other expense and costs which are apportioned on system-wide basis) of operation of said trains on the Enid line during 1948 was $115,365.75, and the revenues derived therefrom, other than for the carriage of mail ($27,-593.59) were: passenger service $16,-953.03; express $11,387.00; baggage $106.63; milk and cream $811.13, or a total of $29,257.79, thus showing a deficit of $86,107.96, or 61.3 cents per train mile. The direct or out of pocket cost on the Hugo line for 1948 was $35,521.36, and the revenues therefrom other than from mail carriage ($9,-601.90) were: passenger service $7,-583.61; express $1,449.36; baggage $92.84; milk and cream $534.93, or a total of $9,666.74, thus showing a deficit of $25,929.46 or 57.1 cents per train mile. The revenues derived from the carriage of mail are not included in the computation because they are received by the company while serving as an agency of the Federal Government and have no relation to the rights and liabilities of the company as a common carrier. Atchison, Topeka & Santa Fe R. Co. v. United States, 225 U. S. 640, 32 S. Ct. 702, 703.

It thus appears that the company in the operations of said trains on both lines sustained an actual direct loss during 1948 or $111,968.58 or an average of 60 cents for each mile operated. From the company's reports to the Interstate Commerce Commission and Corporation Commission of Oklahoma, covering the year 1947, the evidence shows that the company operated its passenger service over its entire system at a loss of $6,799,299 and within the state of Oklahoma of $2,218,176. And in the company's brief attention is called to the fact that like reports for the year 1948, filed since the hearing, reflect corresponding losses of $8,-488,033 and $2,836,849, respectively. The evidence does not disclose the revenues received from the operation of freight trains on either line nor that the opera-

tion of either line including both freight and passenger service was unprofitable, nor that the entire system was operated at a loss during the period.

The extent of the public patronage is reflected by the fact that on the Enid line there was one passenger for each ten miles operated and on the Hugo line one for each two miles operated, or one-tenth person per train mile on the Enid line and one-half person per train mile on the Hugo line. That such decline in patronage is not local but general is reflected from the fact that in 1916 the railroads throughout the United States handled 97.98 per cent of the passenger miles in this country while in 1941 they handled only 9.39 per cent of the passenger miles (Civilian War Transport—a record of the control of domestic operations—Office of Defense Transportation—published May 1, 1948.) And, bearing upon the cause of such decline, in 1914 there were only 11,954 miles of improved highways in the United States while in 1946 there were 349,786 miles of improved highways. In 1915 there was an average of over 40 persons for each motor vehicle registered while in 1947 there was an average of only 3.8 persons for each motor vehicle registered in the United States. In Oklahoma, the 1948 registration reflects one passenger car for each 4.61 persons. In the counties traversed by the Hugo line there was an average of 12.62 persons per passenger car and in those traversed by the Enid line there was an average of 3.92 persons per passenger car (population 1940 census).

The territory through which the Enid line passes is criss-crossed by state and federal highways as well as improved country roads serving practically every community served by the trains. The line from Arapaho south to the state line (a distance of about 100 miles) is paralleled by U. S. Highway 183. There are four daily bus schedules operating along Highway 183 between Clinton and said state line (a distance of approximately 95 miles). Between Enid and Vernon, Texas (the terminus of said line) there are six daily bus schedules over alternate routes. Of the population in the communities served by the Enid line 98 per cent live in communities situate on a state or federal highway and 94.29 per cent thereof have available intercity bus service.

The Hugo line is paralleled by U. S. Highway 70 between Hugo and Idabel (43.5 miles) and by State Highway 21 from Idabel to the Arkansas line. With the exception of Kulli, Oklahoma (having a population of three, according to 1940 census,) all the communities served by the trains are also served by either a state or federal highway. There are fourteen bus schedules operated between Hugo and Idabel and eight daily bus schedules between Idabel and Ashdown (an Arkansas point on the line) through Haworth and Bokhoma, two of the intermediate points on the line. Of the population of the communities served by the Enid line 94.29 per cent have intercity bus service and of the population served by the Hugo line 99.97 per cent have intercity bus service.

The mixed train service proposed to be furnished in lieu of each of the trains if discontinued will consist of a combination passenger and baggage car attached to a freight train serving each of the communities now served by the passenger trains. The schedule time of the run of the mixed trains is much longer than that of the passenger train, and by reason of the varying freight service also being rendered its movement according to the schedule is less likely than that of the passenger train.

Against the discontinuance of trains 609 and 610 on the Enid line there were filed two protests signed by numerous citizens of the town of Drummond, Oklahoma, situate on the line, and at the hearing there was offered as exhibits 32 protests each signed by either a chamber of commerce or citizens and business men of communities served

by said trains, and 27 witnesses testified. Against the discontinuance of trains 773 and 774 on the Hugo line eight witnesses testified and there was introduced as exhibits 20 written protests each signed either by a chamber of commerce or citizens and business men of the communities served.

The evidence in support of the protests in each case is substantially to the following effect: The present passenger, mail and express services afforded by the trains are, in the opinion of the witnesses, necessary to the communities affected. That the mixed trains would not afford adequate service in such respects. That it would not afford a mail service necessary for registered mail and insured parcel post nor an express service necessary for various articles. That by reason of the change in time schedule and delay in transit personal travel would be handicapped and shipments suffer an unreasonable delay. There is recognition of the fact that more people in the territory of the lines ride buses than ride trains, and there is expressed the opinion that with the modernization of the equipment of the trains which is antiquated and poorly heated patronage would be increased and thus solve the problem.

It is urged on behalf of the protestants that by reason of its charter obligation the company is under the absolute duty to furnish passenger train service until it is made to appear that the combined operation of both freight and passenger service was unprofitable, a fact not shown herein; that the mixed train would not be sufficient as a substitute for the passenger train nor afford adequate service; and, therefore, no ground obtains for the discontinuance of the passenger trains.

We think it to be evident that the proposed mixed train service is not an equivalent substitute for the existing passenger train service or that contemplated under a charter which, as here, contemplates both passenger and freight service. The reasons are clearly outlined in Missouri P. R. Co. v. Kansas ex rel. Railroad Commissioners, etc., 216 U. S. 262, 54 L. Ed. 472, 480. Consequently, if the company is under the absolute duty to render passenger train service in absence of showing of loss to its operations as a whole, which is the case here, the proposed mixed train service would not afford justification for the discontinuance of the passenger trains. Hence the first question is whether the company is under the absolute duty to maintain passenger train service.

As supporting the contention that the company is under an absolute duty to maintain passenger train service, sole reliance is placed on Chesapeake & Ohio Railway Co. v. Public Service Commission, etc., 242 U. S. 603, 61 L. Ed. 520, from which there is quoted the following:

" . . . the act whereby the railway company was granted the right to construct and operate the branch line did not leave the company free to devote it to freight service only or to passenger service only, . . .

"Thus, in legal contemplation, the branch line was devoted to the transportation of passengers as well as of freight . . . . An obligation to use it for both was imposed by law, and so could not be thrown off or extinguished by any act or omission of the railway company."

In the cited case the carrier sought to avoid its charter obligation by furnishing no passenger service whatever. Such fact is noted in Atlantic Coast Line R. Co. v. Public Service Commission etc., 77 Fed. Supp. 675, where, in construing the doctrine, there is said:

" . . . The basis of the rule is said to be that although a railroad may not constitutionally be compelled to operate its system as a whole at a loss, Railroad Commission of Texas v. Eastern Tex. R. Co., 264 U. S. 79, 44 S. Ct. 247, 68 L. Ed. 569, yet it may not

seek to retain its franchise and at the same time avoid its contractual obligation to provide reasonably adequate service arising from the franchise by singling out specific parts or branches of its business for complete elimination."

Therein the contention was made that the carrier, by accepting the privilege of operating in the state, was under contractual duty to continue the facility notwithstanding loss. In reference thereto there is stated:

"The contention overlooks the distinction between the *absolute* duties of a carrier and its *relative* duties. This distinction is admirably summarized by the court in Southern Ry. Co. v. Public Service Commission et al., 195 S. C. 247, at page 261, 10 S. E. 2d 769. It cites, among others, the case of Kurn v. State. 175 Okla. 379, 52 P. 2d 841, and quotes its effect as follows: 'In performance of absolute duty by railway company, question of expense is not to be considered, but, where duty sought to be enforced is one of additional convenience rather than necessity, question of expense to company and relative benefit to public is deciding factor, and may not be disregarded.' "

The doctrine so announced was recognized and applied in Chicago, B. & Q. R. Co. v. Illinois Commerce Commission, 82 Fed. Supp. 368, 377, which involved the question that is involved herein. It is there stated:

"Plaintiff's system-wide railroad earnings are immaterial in a proceeding to discontinue and abandon local railroad passenger train service, such as that formerly provided by plaintiff's trains 51 and 52, where there is no public necessity, as distinguished from public convenience, for the continued operation of said trains and where the trains can only be operated at an out-of-pocket loss to plaintiff.

"Plaintiff cannot be compelled to operate local railroad passenger trains, such as Nos. 51 and 52, at an out-of-pocket loss, where there is no public necessity, as distinguished from public convenience, for the continued operation of said trains. Defendants' attempt to compel the restoration of trains 51 and 52 pursuant to Section 49a and/or said Commission's order in Docket 36251 by invoking the severe penalties by fine and imprisonment provided in the Illinois Public Utilities Act, is arbitrary and unreasonable, denies to plaintiff the equal protection of the law and, if successful, would impose an illegal burden on interstate commerce.

"In determining whether public convenience and/or necessity requires the restoration of plaintiff's local railroad passenger trains 51 and 52, the rules announced in older legal precedents established prior to the transportation revolution wrought by the national system of improved highways and the widespread use of the private automobile, the certificated bus and truck, are no longer applicable, inasmuch as the widespread use of the motor vehicle on said highways not only destroyed the railroads' former monopoly of the passenger transportation business, but it has also made the local railroad passenger train an obsolete form of transportation."

The same doctrine in substance is recognized and applied in Southern Ry. Co. v. Public Service Commission et al., 195 S. C. 247, 10 S. E. 2d 769; Corporation Commission, etc., v. Southern Pac. Co., 55 Ariz. 173, 99 P. 2d 702; In re Application of Chicago, Burlington & Quincy Railroad Co. v. Municipalities of Holdrege, 152 Neb. 352, 41 N. W. 2d 157; Chicago, B. & Q. R. Co. v. Nebraska State Ry. Commission, 152 Neb. 367, 41 N. W. 2d 165; Lynchburg Traffic Bureau v. Commonwealth, etc., 189 Va. 612, 54 S. E. 2d 66; Texas & New Orleans R. Co. v. Railroad Commission of Texas (Tex. Civ. App.) 220 S. W. 2d 273.

The holding in the quoted case that there is no absolute duty in absence of public necessity is not at variance with the holding in Chesapeake & Ohio Railway Co. v. Public Service Commission, supra. The effect thereof is merely to declare the line of distinction between absolute and nonabsolute duties. The existence of such distinction had been declared before and is recognized

in the Chesapeake case. In the earlier case of Atlantic Coast Line Railroad Co. v. Wharton, 207 U. S. 328, 335, 28 S. Ct. 121, 123, 52 L. Ed. 230, there is said:

"The term 'adequate or reasonable facilities' is not in its nature capable of exact definition. It is a relative expression, and has to be considered as calling for such facilities as might be fairly demanded, regard being had, among other things, to the size of the place, the extent of the demand for transportation, the cost of furnishing the additional accommodations asked for, and to all other facts which would have a bearing upon the question of convenience and cost."

In the Chesapeake case, immediately following the language relied on by protestants which is quoted, supra, it is also said:

" . . . It follows that the order, instead of enlarging the public purpose to which the line was devoted, does no more than to prevent a part of that purpose from being neglected.

"One of the duties of a railroad company doing business of a common carrier is that of providing reasonably adequate facilities for serving the public. This duty arises out of the acceptance and enjoyment of the powers and privileges granted by the state, and endures so long as they are retained. It represents a part of what the company undertakes to do in return for them, and its performance cannot be avoided merely because it will be attended by some pecuniary loss. (Citations omitted.) That there will be such a loss is, of course, a circumstance to be considered in passing upon the reasonableness of the order, but it is not the only one. The nature and extent of the carrier's business, its productiveness, the character of service required, the public need for it, and its effect upon the service already being rendered, are also to be considered. Cases, supra. Applying these criteria to the order in question, we think it is not shown to be unreasonable."

Therein, the public need for the passenger trains was not even questioned; the objection to the installation of the passenger service was based solely upon the fact it would prove unremunerative. The case is no authority for holding that there could obtain an absolute duty to render such service in absence of a public need therefor. The principles announced negative the very idea that it can be so construed. It is the fact that the transportation revolution has obviated the public necessity for passenger train service in so many instances where it theretofore obtained without exception that justifies the statement that the earlier decisions taking judicial knowledge of public necessity are no longer precedents as is declared in Chicago, B. & Q. case quoted, supra. Such an interpretation of the holding therein is given by the Supreme Court of Nebraska in Re Application of Chicago, Burlington & Quincy Railroad Co. v. Municipalities of Holdrege, supra, where there is said:

"In determining whether public convenience or necessity requires the continuance of trains 151 and 152, the rules announced in older legal precedents established prior to the transportation revolution wrought by public highways, private automobiles, certificated bus and common-carrier trucks and private trucks carrying commodities to customers, are no longer applicable, for the reason that the same have not only destroyed the railroad's former monopoly of the passenger transportation business, but it has also made the local railroad passenger train an obsolete form of transportation. See Chicago, B. & Q. R. R. Co. v. Illinois Commerce Commission, supra."

It follows from these holdings that as, in effect, declared in Chicago, B. & Q. R. Co. v. Illinois Commerce Commission, supra, it is only where passenger train service is required to meet a public necessity, in contradistinction to affording a public convenience, that there obtains an absolute duty to maintain the same. In the absence of such public necessity the question is, necessarily, the alleviation of a public inconvenience. Concerning this we stated in Missouri-Kansas-Texas R. Co. v.

State, 189 Okla. 685, 119 P. 2d 835, the following:

"When a common carrier is called upon to alleviate a mere public inconvenience in the matter of transportation, the cost to be incurred thereby is of paramount importance. If the maintenance of facilities necessary to relieve the situation will result in financial loss in performing the particular service wherein the inconvenience arose, to require such facilities would be to take the carrier's property without due process of law."

The fact that there is no public necessity, as distinguished from public convenience, is made clearly to appear and the fact that such trains can be operated only at a loss is equally clear unless there is merit in the contention that improvement in the train equipment would probably encourage patronage sufficient to enable their operation without loss. If it appeared that the loss of patronage was due to the poor quality of such equipment or that with improvement of equipment patronage would be increased to a sufficient degree to reimburse the cost of the improvement and continued operation, there would be justification for such contention. But none of such facts appears and the very idea that the poor quality of the equipment could be the cause of the lack of patronage or that its improvement would invite a substantial public patronage is negatived by the facts shown. A similar contention was made in the Nebraska case, quoted, supra, and what was there said is equally applicable here. We quote:

"The appellees contend that the appellant has done everything it can to discourage, and nothing whatsoever to encourage and increase use of these trains, and should not now be heard to complain because of alleged conditions of its own making. It is suggested that better schedules might be arranged and the train improved as to equipment to attract passenger traffic. The passenger transportation facilities on trains 151 and 152 are obsolete and outmoded. There is no evidence to show that under any circumstances would the passenger traffic improve on the two trains in question. There has been no apparent effort made by the public in the communities served by these trains to utilize such passenger service. Contra, the evidence shows the residents of the localities traversed by these trains do not care for the service by their failure to give them patronage. See Northern Pac. Ry. Co. v. Board of Railroad Commissioners, supra."

We hold there exists no public necessity for the operation of trains 609 and 610 on the Enid line and no public necessity for the operation of trains 773 and 774 on the Hugo line, and that therefore the company is under no absolute duty to operate the trains on either line. We hold, further, that such trains can be operated only at an out of pocket loss and that, therefore, the company is under no duty to operate said trains on either line for the convenience of the public. In view of these conclusions we think it unnecessary to consider the matter of the mixed trains which the company is committed to operate upon discontinuance of the passenger trains.

The orders of the Corporation Commission in causes 34356 and 34357 are reversed, with directions to enter in each case an order granting the application upon the terms sought.

CORN, LUTTRELL, HALLEY, JOHNSON, and O'NEAL, JJ., concur. DAVISON, C.J., and WELCH, J., dissent.

WELCH, J. (dissenting). I would affirm the action of the Corporation Commission. That body had before it the numerous witnesses who intervened and protested removal of these trains, and testified as to the need for the train services rendered. The commission observed the service being rendered by transportation of passengers, baggage, express, mail and milk. It is quite apparent that the commission was convinced of the value of these services and of the need of these services by the people.

The majority opinion is based primarily, if not solely, on the matter of profit or lack of profit to the railway. There the theory is followed that this continued operation would result in loss. Apparently it would, but such loss is rather insignificant as compared to the aggregate income of the vast railway system of the "Frisco." And it was vigorously urged in oral argument that improved service and modern equipment could reduce expenses and reclaim patronage lost by present service and long used equipment and thus reduce the loss on this train operation, or change it to a gain.

I think the case should be considered on the broader ground of the needs and necessities of the people and the obligation of the carrier.

The result of the majority decision will be to cast all this railway travel and transportation, whatever it amounts to, on the highway. As a further result, this decision will promote or encourage other such applications to abandon railway service where the revenue therefrom as a separate operation is not just now profitable. Thus much additional travel and transportation will be cast on the highways over the state. But all know that our highways are now over crowded. This is true to the point of increasing the hazard to human life. Further crowding of these roads must lead to greater hazard, and greater expense.

I think we should preserve both methods of travel and transportation. This railway carrier, after a period of cessation of this service, can of course reinstate the service when they have decided that more efficient equipment and operation, with perhaps more pressing need for the service, will make it pay. But in that interim the added cars, buses and trucks on the highway will have taken their toll of added highway expense and perhaps of added loss of life and limb as well.

While a continuation of this service might result in some financial loss from this separate operation, until the carrier by modern efficiency could regain lost patronage, and show profit from that, or from a natural gain of business, I think that loss would not be a price too high to pay to preserve the needed service. It seems to me it is no time now to curtail this needed service to the detriment of these citizens and to the burden of the roads and highways.

Whatever, of the various considerations, guided the Corporation Commission, I am convinced the conclusion of that body to continue this railway service for the present was correct and that we should affirm it.

In Missouri-K. T. Ry. Co. v. State, 189 Okla. 685, 119 P. 2d 835, the court said:

"So far as the issues in this case are concerned, the absolute duty of the company could be no more than to furnish reasonably adequate mail and express facilities along the line of road in question. Beyond that requirement the point of consideration resolves itself into one of convenience to the public as counterbalanced with cost to the company. If reasonably adequate service is being rendered by the facilities in use, the item of cost of additional facilities is the controlling factor. The furnishing of any facilities in excess of those that are essential to reasonably adequate service is not to be classed among the absolute, or charter, duties of the company."

And further in the opinion it was said:

"In the instant case, as we have said, the public needs will be reasonably met by the service of the two night trains."

And further it was said:

"When a common carrier seeks to avoid an absolute duty, the revenues from other sources on its system are to be considered in determining the question of due process in such case. Chesapeake & Ohio Ry. Co. v. Public Service Comm. of West Virginia, 242 U. S. 603, 37 S. Ct. 234, 235, 61 L. Ed. 520. . . ."

As the majority opinion points out, the proposed mixed train service is not an equivalent substitute for the existing passenger, express, mail, baggage, milk and cream service. Therefore the removal of these two trains would in effect be an abandonment of this present service. These are the only such trains operating over this line. This case differs from the M.-K.-T. case where other passenger trains over the same line amounted to reasonably adequate service. There was there no abandonment of the service. Since this is the only such service now furnished its continuance is within the "absolute duty of the company" as that expression is used in the M.-K.-T. case, supra.

And under the last- quoted portion of the former decision, the freight revenues on this line should be considered since the carrier seeks to avoid this absolute duty by substituting freight train service which, as the evidence demonstrates, is not an equivalent substitute for the existing passenger train service.

We must bear in mind that the protestants requested, but the company expressly declined, to furnish a statement of the freight rates derived from the operation of the branch line in question. Thus it is fair to assume that the profit on freight business is substantial, and I think it is not unfair to assume that the profit of combined freight and passenger service would amount to a sufficient profit, if not a satisfactory profit.

In Werner v. C. M. St. P. R. R. Co., 14 Wis. R. C. 573, it was said that it could not be expected that the passenger business on a branch line would be entirely self-supporting.

Since there is no Oklahoma decision directly in point, we may look elsewhere for guiding authority. In the case of Gardner v. Commerce Commission, 400 Ill. 123, I find complete authority to affirm the Corporation Commission's order here.

The Illinois case, upon analyzing the figures, is peculiarly applicable to the facts in the case at bar. That case involved a branch line, as this one. There the Commerce Commission denied application to discontinue the passenger train service, as here. There, likewise, operation was one-passenger train daily each way. There the mileage involved was 39 miles, here it is 240 miles. There the annual operating loss per mile was $314.69, while here it is $311.51. There the line served eight towns with a total population of 13,771 or 353 persons per mile. Here the lines involved serve 36 towns with a population including 1950 increases of 80,623 or 335 persons per mile. There, as here, the passenger trains carried mail, passengers. express, baggage, milk and cream.

Thus it is observed that these Oklahoma lines, though serving less persons per mile, show in the aggregate less loss per mile than in the Illinois case.

There is more reason for the state to deny the application in this case than there was in the Illinois case, because in this case in Oklahoma these lines furnish passenger train service to seven county seat towns, and two of them have no other railroad.

This county seat service has some importance to the state, in law enforcement, in the transaction of business by the citizen with his county seat, and in the citizen's attendance upon the courts at the county seat as witnesses and jurors.

It is well known that flood waters frequently block our highways, but seldom interfere with rail traffic. If this rail passenger service is eliminated then a flooded highway or washed-out bridge might seriously interfere with the business of the county seat, and especially is that true as to the two county seats which have no other rail service.

Our Constitution gives some recognition to the value of rail transporta-

tion to the county seats by reason of the provision in art. 9, sec. 14.

In Yellow Transit Company v. State, 198 Okla. 229, 178 P. 2d 83, this court held:

"Under Art. IX, sec. 20, Constitution of Oklahoma, as amended by Senate Bill 61, S. L. 1941, p. 544, on appeal from the Corporation Commission, this court is required to review the evidence, and must sustain the order appealed from if it is supported by substantial evidence."

This is perhaps a universal rule. At any rate, it was applied in Norfolk & W. R. Co. v. Public Service Commission, 82 W. Va. 408, 8 A. L. R. 155. In that case the Public Service Commission had required the furnishing of shipping facilities and upon appeal by the railway the order was affirmed. It was held in paragraph three of the syllabus that "findings of fact by the Public Service Commission based upon evidence to support them will not be reviewed by this court."

The majority opinion, as I view it, merely substitutes the court's view of the evidence for the Corporation Commission's view of the evidence. This is contrary to the rule recognized in the Yellow Transit case, supra, and others to the effect we should affirm if the commission's finding is supported by substantial evidence. The commission found this passenger train service was a public necessity. There was substantial evidence offered by the appearing protestants to support that finding. The majority opinion holds there exists no public necessity. But we should affirm the commission, supported as it is by substantial evidence, even though the opposite conclusion might also have some support by substantial evidence.

In Southern Ry. Co. v. South Carolina Public Service Commission et al., 31 Fed. Supp. 707, the commission had refused application to discontinue two passenger trains, one train a day each way, on a short line of its railway system. The Federal Court refused to interfere with the commission's order. The opinion by Parker, Circuit Judge, contains legal philosophy so well in point with my dissenting view that I quote extensively from the opinion as follows:

" . . . The remainder of the line, approximately 75 miles in length, being the portion between Branchville and Augusta, serves as a highway for traffic of local origin or destination and also for freight from Charleston to Augusta and the West.

"As a result of the building of good roads and the use of buses and private automobiles, plaintiff has experienced a loss of passenger traffic, especially that of a local character. It has reduced the passenger service on the 75 mile stretch of this railroad to one train a day each way between Blanchville and Augusta, and finds that even this minimum service results in a loss. . . . For this reason plaintiff desires to abandon all passenger service on the portion of the line between Branchville and Augusta, while continuing to use that portion of the line for transportation of freight and while maintaining passenger service over the Branchville-Charleston portion of the line as a part of its main line between Columbia and Charleston. . . .

"The Public Service Commission denied the application of plaintiff for leave to discontinue the trains and abandon passenger service on the portion of the road between Branchville and Augusta on the ground that the maintenance of passenger service is required by the franchise under which the road is operated, *that the discontinuance of the trains in question* would leave the communities on that portion of the road without adequate service for express and mail as well as without rail passenger service, and that, to insure the fair treatment of these communities contemplated by the statutes of the state, the operation of the trains should be continued. . . ."

" . . . The question before us is not whether the action of the state authorities of which complaint is made is wise, but whether it is unlawful; and, in view of the charter obligations of

the plaintiff to maintain passenger service on the road in question, we cannot see how an order of the Public Service Commission refusing to permit abandonment of passenger service on a portion of the line can be said to be unlawful. . . .

"Since, therefore, plaintiff is charged with the duty under its franchise of maintaining passenger service on the entire line of the railroad, an order enforcing that duty may not be said to be unreasonable and arbitrary merely because its performance may result in loss to plaintiff. Atlantic Coast Line v. North Carolina Corporation Com., 206 U. S. 1, 27 S. Ct. 585, 51 L. Ed. 933, 11 Ann. Cas. 398; Missouri Pac. Ry. Co. v. Kansas, 216 U. S. 262, 30 S. Ct. 330, 54 L. Ed. 472; Chesapeake & O. Ry. Co. v. Public Service Commission, supra; Fort Smith Traction Co. v. Bourland, supra; State v. Board River Power Co., supra. As said by Mr. Justice (later Chief Justice) White in the Atlantic Coast Line case (206 U. S. 1, 27 S. Ct. 595, 51 L. Ed. 933, 11 Ann. Cas. 398), 'As the primal duty of a carrier is to furnish adequate facilities to the public, that duty may well be compelled, although, by doing so, as an incident some pecuniary loss from rendering such service may result.' . . .

"Even if there were no charter obligation with respect to maintaining passenger service over this entire line of railroad, we do not think that the order of the Commission denying to the company the right to discontinue all passenger service on this portion of the line could be held arbitrary and unreasonable so as to fall under the condemnation of the due process or the equal protection clause. The State of South Carolina, for the convenience and welfare of its people, had chartered this line of railroad from Charleston to Augusta. People along the line had been served by it for over a hundred years. The discontinuance of the trains in question would leave those on a large part of the line without the benefit of passenger service and without the benefit of the express and mail service dependent upon the operation of passenger trains. The Company intends to use the Branchville-Augusta portion of the line for the hauling of freight because of its 'convenience value', as

explained by one of the witnesses. We cannot say that it was arbitrary and unreasonable for the Commission to consider the 'convenience' of the communities served and order that the company continue to maintain the customary service ordinarily afforded by railroad companies over it. . . .

"Plaintiff is, of course, interested primarily in using the road as an integral part of its great interstate system. It accordingly uses the 61-mile portion between Branchville and Charleston as a part of its main line from Columbia to Charleston, runs excellent trains over it and has no idea of abandoning passenger service so far as that portion is concerned. Likewise it proposes to use the Branchville-Augusta portion for the convenience of its system in the hauling of freight. The Commission, however, must look to the interest of the people of South Carolina, as well as to that of the railway system; and we cannot think that, in the light of the purpose for which the charter was granted, it is arbitrary and unreasonable action to require that passenger service be continued over the entire line, and not merely on the portion where operation is to the advantage of plaintiff's system. 'The primary duty of the public utility is to serve on reasonable terms all those who desire the service it renders. This duty does not permit it to pick and choose and to serve only those portions of the territory which it finds most profitable, leaving the remainder to get along without the service which it alone is in a position to give. An important purpose of state supervision is to prevent such discriminations.' United Fuel Gas Co. v. R. R. Com. of Kentucky, 278 U. S. 300, 309, 49 S. Ct. 150, 152, 73 L. Ed. 390.

" . . . It must be remembered that the issue before the Commission was not whether the plaintiff should be required to furnish more or less passenger service over the portion of the line in question, but whether it should be permitted to abandon all passenger service over it."

If the order of the commission is *arbitrary* it should be reversed. It is *arbitrary* if no substantial evidence supports the affirmative finding of public

need. That is the rule of several of the cases cited in the majority opinion. The converse of that rule would be that the order is *not arbitrary* if the finding is supported by substantial evidence, and we should affirm. The record discloses to me that numerous cities and towns and many citizens made proof of public need. The evidence was substantial. It convinced the commissioners. They found affirmatively and unanimously that public need did exist. We should affirm under the last-stated rule and under the specific rule of the Yellow Transit case, supra.