## ST. LOUIS–SAN FRANCISCO RY. CO. v. STATE.
### No. 35925.

Supreme Court of Oklahoma.

Oct. 13, 1953.

John E. McCullough, St. Louis, Mo., Satterfield, Franklin & Harmon, Oklahoma City, for plaintiff in error.

James G. Welch, L. D. Thomas, Jr., Montford Johnson, Oklahoma City, for Corporation Commission of the State.

James E. Douglas, Durant, for protestants.

JOHNSON, Vice Chief Justice.

From an order of the Corporation Commission of Oklahoma denying appellant permission to discontinue the operation in Oklahoma on its branch line passenger trains 773 and 774 between Hugo, Oklahoma, and Ardmore, Oklahoma, appellant appeals.

The grounds alleged for permission to discontinue are that public necessity and convenience no longer require the continued operation of these trains at a tremendous loss to the company, which condition has existed for several years and will continue. It is further represented that if allowed to discontinue these trains that the towns will be served by mixed trains.

The substance of the Commission's finding was that the company by its charter and franchise was under an absolute duty to furnish adequate and reasonable passenger service and that the obligation could be avoided only by a showing that the rendition thereof was an undue burden or loss upon the entire system. That the only passenger service being rendered was that afforded by these trains; that there was no showing that the operation of the entire system was unprofitable; that the mixed train service proposed would not afford reasonable and adequate service.

The company's complaint is that the evidence does not sustain the findings nor the order, and that such order would deprive it of its property without due process of law, and would constitute an unauthorized burden upon interstate commerce.

The record discloses that trains 773 and 774 operate presently daily between Hugo, Oklahoma, and Ardmore, Oklahoma, a distance of about 106 miles, serving 24 communities. Train 773 is a westbound train from Hugo to Ardmore, leaving Hugo at

2:20 p. m. and arriving at Ardmore at 6:20 p. m. Train 774 is the east bound train from Ardmore to Hugo, leaving Ardmore at 8:30 a. m. and arriving at Hugo at 12:25 p. m. Each train makes seven scheduled stops between the two points, the remaining communities being served by flag stops.

Prior to 1951, trains 773 and 774 operated between Ardmore, Oklahoma and Hope, Arkansas. By virtue of our opinion in the case St. Louis-San Francisco Railway Co. v. State, 204 Okl. 432, 230 P.2d 709, reversing an order of the Corporation Commission denying the Frisco's application, these trains were discontinued east of Hugo.

The evidence shows that the trains between Hugo and Ardmore have for a number of years been operating at a substantial deficit, which has greatly increased during the recent years by reason of the rapid decline of public patronage. The direct or out-of-pocket cost (which does not include taxes, depreciation of rolling stock, administration expenses, and other expenses and costs which are apportioned on a system-wide basis) of operation of said trains during the 24 months of 1950 and 1951 was $138,856.52. The revenues derived from these trains over the same period, other than for the carriage of mail ($42,042.93) were: Passenger service $8,-727.76; Baggage $34.97; Express $9,285.-60; Milk $322.96; or a total of $18,371.29, thus showing a deficit of $120,485.23, or 78.12 cents per train mile. It was further shown that if the fully distributed expenses for the system were applied against the revenue for the two-year period, the trains were operated at a deficit of $262,188.22, or $1.70 per train mile, and even if the revenue derived from the carriage of mail be included (which is not a common carrier duty) the out-of-pocket loss during 1950 and 1951 was $78,442.30, or nearly 59 cents per train mile, and the fully distributed loss was $220,145.-29, or nearly $1.43 per train mile.

It is further shown that from the annual reports of the Frisco to the Interstate Commerce Commission and to the Corporation Commission of Oklahoma that the company operated its passenger service over its entire system in 1950 at a loss of $6,935,465 and in 1951 at a loss of $7,986,920 and within the State of Oklahoma in 1950 at a loss of $2,-419,247 and in 1951 at an estimated loss of $2,500,000. It was also shown that, with the exception of the war years, the Frisco's system-wide and state passenger service has been operated at an increasing annual deficit since 1936. It was shown that in the State of Oklahoma for the years 1927 through 1950 the Frisco's rate of return for all of its operations was less than three per-cent of its investment, which ranged from $84,000,000 to $103,500,000; that its highest return was only 2.82 per cent and its lowest was 2.25 per cent during such period.

The decline in public patronage of trains 773 and 774 is shown for each of the nine agency stations on the line for each year from 1922 through 1952. The average revenue per month was $12,846 in 1922 and in 1952 it was $731. It was further shown that one of the Frisco officials made two complete runs on 773 on October 30, 1951 and on November 29, 1951, and two complete runs on train 774 on November 29, 1951, and November 30, 1951; that on these trips the total number of paid passengers using the train for any distance whatsoever ranged from three on one train to ten on another. The total passenger revenue ranged from 59 cents on one trip to a high of $8.77 on another. Another official made complete trips on train 773 on October 4, 1951 and December 11, 1951. He found the average number of passengers per train over the entire trip ranged from a low of 0.7 to a high of 3.8 or a total of only 2.6. He also found that the passenger revenue for the four trips added together amounted to only $27.78 or a total revenue per train mile of 6.5 cents. An additional passenger count was made by this official for every trip of both trains for the months of December, 1951, January, February and the first two weeks in March, 1952, which showed the average number of passengers on both trains for every trip during the entire month of December, 1951 was 1.68; during January, 1952, 1.37; during February, 1952, 1.39; and during the first two weeks of March, 1952, 1.16. It was also shown that the minimum number of employees required to operate each of these

trains was four. In other words, that during the last period checked, the average number of passengers was less than one-half the number of the train crew required.

In order to show that the decline of public patronage of branch line passenger trains is not a purely local situation because of some fault of the Frisco, but rather a general condition throughout the nation, and existing for a number of years, it was shown by exhibits from Federal governmental agencies (Office of Defense Transportation and the I. C. C.) that while in 1916 the railroads throughout the United States handled 97.98 per cent of the passenger miles in this country, in 1941 they handled only 9.39 per cent of the passenger miles, and that the ratio dropped to 9.38 per cent in 1949 and to 8.12 per cent in 1950. It was further shown that no longer are the railroads even in close competition for passenger business with the motor vehicle, for, in 1950, the highways handled nearly 90 per cent of the passenger miles in this country.

Bearing on the cause of the decline in railroad passenger business, both on this particular line and throughout the nation, it was shown that, while in 1914 there were only 11,954 miles of improved highways in the United States, in 1947 there were 362,911 miles of improved highways. In 1910 there was an average of over 200 persons for each motor vehicle registered, while in 1950 there was an average of only 3.8 persons for each motor vehicle registered in the United States. In Oklahoma there is an average of only 3.6 persons to every motor vehicle registered. It was shown that the Frisco right-of-way between Hugo and Ardmore is paralleled by U. S. Highway 70, over which Jordan Bus Company operates 11 bus schedules daily, five eastbound from Hugo and six westbound from Ardmore. The evidence reflects that the highway and railroad tracks are less than a mile apart in any one point for 80 per cent of the entire distance and that the farthest distance between the highway and railroad at any place along the line is less than five miles; that of the 24 communities presently served by trains 773 and 774, only four communities, having a total population of only

170, are not situated directly on a Federal, State or all-weather highway; that 99.59 per cent of the population of the communities served by this line live in communities situated on a highway; that 98.21 per cent of said population have intercity bus service available; that 90.99 per cent of said population have other railroad service than the trains in question; that 91.48 per cent of said population are served with highway express service.

An official of the Frisco testified that due to the revolution in transportation over the past 20 years, in which other forms of transportation, primarily the private automobile, have practically supplanted the railroad as a means of transportation between short distances, the local passenger train service has been rendered almost obsolete; that the railroads have had a very substantial and steady decline in passenger traffic, beginning in 1920, and continuing up to the present time, with the exception of the war years; that recognizing this fact the railroads in general are making a determined effort in the interest of good management to remove from service all of their non-profitable and lightly patronized passenger trains, and that a great many miles of such service have already been eliminated. This witness pointed out that, while railroads render the public a self-supporting transportation service, they also have the burden of paying substantial taxes which, in part, are used to subsidize their competitors. These taxes, besides going to the support of general services of the Government, including schools, are used for the construction and maintenance of highways, airports, rivers and harbors used by competing forms of transportation. It was pointed out that the railroads pay approximately 17.5 per cent of all ad valorem taxes in the State of Oklahoma; that railroads can not bear all of the costs of their operations, and expect to compete with other forms of transportation whose operating costs are to a large extent borne by the taxpayers. He further pointed out that even discounting the effect of the competition of other commercial carriers, the principal reason for decline of the use of railroads for short-distance transportation of passengers was the private

automobile, which has so greatly increased in number during the past few years. He further testified that there was no hope of securing more revenue by further increases in passenger fares, that needed relief can only come from economizing by the employment of every known efficiency method in order to reduce costs. The elimination of unprofitable train operations, such as trains in issue, is necessary to the continuance of the railroads upon a sound and economical basis.

Protestants' evidence consisted of 52 witnesses, the substance of their testimony being that in their opinion, the passenger, mail and express services of the trains in question were necessary to the communities represented.

Of all the 52 witnesses appearing, only 18 testified that they rode the trains more often than one or two times during the year. The majority of witnesses stated that they had never been on the trains; that in their opinion, the passenger business would increase with improved facilities.

The witnesses testifying to frequently using the trains as passengers were generally persons who happened to live close to the railroad station in communities situated two or three miles off of the highway, such as Kiersey, Provence, Durwood, Frisco Junction and Simpson. The use of the trains by these persons was limited to trips into larger towns some five or ten miles away. Some of these persons stated that they could use the Jordan bus by walking a short distance further, or by paying a slightly higher fare.

Some of the witnesses testified that they had made surveys to secure public opinion in certain areas as to whether the trains were necessary to the community (this type of evidence, while admitted by the Commission, was objected to as hearsay); and that there were some merchants and business people who objected to taking off the trains because of the loss of mail and express service. There was testimony of the need of parcel post and express service for businesses such at morticians, cosmetic manufacturers, auto parts, cattle business, grocery and feed stores, hardware companies, drygoods stores, baby chicks and pigs, school supplies, etc.

One of the principal complaints to the removal of these trains was that, while it was admitted that their services were not generally used, the trains were necessary in times of emergency, such as ice storms, which might block the highways and prevent the movement of busses and private automobiles. In addition to this, there were those who said that the removal of these passenger trains would prevent the settlement of new industry in the communities affected.

The majority of protestants' witnesses who were asked directly the question of whether the trains were a necessity or a convenience admitted that they were only a convenience.

It was upon this factual situation that the Commission based its finding and order.

Under the provisions of the constitution, this Court, on appeal from an order of the Corporation Commission, is required to review the evidence for the purpose of determining whether the order appealed from is supported by substantial evidence, and when there is such evidence reasonably tending to support the order of the Commission, such order will be sustained; and, conversely, if the order is not so sustained the Commission's order will be reversed. Chicago R. I. & P. Ry. Co. v. State, 203 Okl. 659, 225 P.2d 363.

After a careful examination of the entire record, including all the evidence, we hold that the Commission's Order, denying appellant permission to discontinue passenger trains Nos. 773 and 774 was not supported by substantial evidence reasonably tending to sustain the order. St. Louis-San Francisco Ry. Co. v. State, supra.

Under the factual situation in the instant case our decision herein is in line with our holding in the last named case (Frisco Case) and in accord with the modern trend of opinion, or philosophy that passenger trains are operated primarily for the carriage of passengers and if the public abandons the trains for passenger travel,

there is no duty or obligation to continue their operation at a substantial loss; and in a proceeding to discontinue certain trains, the revenue, expenses and losses shown in the operation of a train have a direct bearing upon whether or not public convenience and necessity require the continued operation of any particular train. Re Great Northern Ry. Co. v. South Dakota Public Utility Commission, 88 P. U.R.(N.S.) 180, 184. For these reasons the order of the Corporation Commission is reversed with directions to enter an order granting the application upon the terms sought.

HALLEY, C. J., and CORN, DAVISON, O'NEAL and WILLIAMS, JJ., concur.

BLACKBIRD, J., dissents.