# Richmond

LYNCHBURG TRAFFIC BUREAU, A CORP. v. COMMONWEALTH
OF VIRGINIA, EX REL.

June 20, 1949.

Record No. 3518.

Present, Gregory, Eggleston and Miller, JJ.

The opinion states the case.

*W. G. Burnette* and *Powell Glass, Jr.*, for the appellant.

*Horace L. Walker, Richard T. Wilson, Jr., Edward M. Hudgins* and *Hewitt Biaett*, for the appellee.

MILLER, J., delivered the opinion of the court.

On September 14, 1948, the State Corporation Commission allowed The Chesapeake and Ohio Railway Company, hereinafter called appellee, to cease operation of two passenger trains known as Nos. 11 and 12, on its James River Division between Richmond and Lynchburg, Virginia. The Lynchburg Traffic Bureau, referred to herein as appellant, and which, along with other interested parties, opposed the application of the carrier to discontinue such public service, appealed from that judgment and order. The matter is now before us for review.

Several assignments of error are made to the judgment and order of the Commission. They may be consolidated and set forth as follows: Appellant asserts that—

1. Appellee, successor to the Richmond and Alleghany Railroad Company, has failed to perform the obligations imposed upon its predecessor by an Act of the General Assembly of Virginia of February 27, 1879, Acts 1878-79, ch. 139, p. 118, which, among other things, required that the road along this route "be a first class railroad, * * * equipped with ample accommodations for all passenger travel and freight transportation."

Appellant compares the services rendered on this division between Lynchburg and Richmond with that on the main line between Charlottesville and Richmond, and asserts that it discloses an unreasonable and unlawful discrimination against the service rendered on the route in question, which is violative of appellee's franchise obligation. It invokes the aid of section 3772 of the Code, which provides for enforcement of the obligations imposed by the Act of 1878-79 against the Richmond and Alleghany Railroad Company or its successor.

2. That public convenience and necessity require the operation of these trains between Richmond and Lynchburg, and their continued operation is reasonably necessary for adequate service to the public.

In elaborating upon this assignment of error, appellant says that if only a few passengers are now carried on trains Nos. 11 and 12, it is because of the unreasonably poor

service rendered by appellee over a period of years and to permit discontinuance of these trains will, in effect, allow appellee to profit by its own wrong at the expense of the traveling public and the communities served.

The scope of the testimony and evidence heard and considered by the Commission was wide. To recite it in detail would serve no good purpose. Yet, the salient facts that disclose the conditions obtaining incident to the operation of these trains, such as the cost incurred, the use made of the services by the public, and the character of other transportation furnished by this and other carriers to the territory and communities involved, must be recited for an understanding of the problem presented to the Commission.

The road maintained by appellee from Richmond to Lynchburg follows the curving course of the James River and is primarily a single track. The distance is 147 miles as compared with 112 miles by highway.

Trains Nos. 11 and 12 actually consist of only one unit or train. Designated as train No. 11, it leaves Richmond daily, except Sunday, at 5:15 o'clock p. m., and arrives in Lynchburg at 10:30 o'clock p. m. As train No. 12, it leaves Lynchburg, Sundays excepted, at 2:30 o'clock a. m., and arrives in Richmond at 8:10 o'clock a. m. These trains are described by the superintendent of passenger transportation as consisting of "one car unit which contains motor equipment, railway motor car, a baggage compartment and a smaller compartment with seats. * * * and, in addition, we operate what is known as a trailer coach." When motor car power is not available (which, however, is seldom), they are operated by regulation steam passenger equipment.

In 1928, due to the fact that passenger service on this line, which was then operated with steam equipment, was being maintained at a considerable loss, application was made to the Commission for permission to discontinue these trains. The right to terminate their operation was refused. To lessen the loss being sustained, the more economical car and lighter equipment were put in use. Though the equip-

ment is not modern, there is evidence that it is reasonably comfortable and maintained with a fair degree of cleanliness.

There are fifty-five intermediate stops along the 147 mile route. According to the schedule, this averages a stop about every two and one-half minutes. However, the trains do not stop at all of these flag stations by any means. This is due to the fact, as we shall presently see, that seldom are there passengers on the train to get off or any waiting to get on. However, each station must be approached at a speed and under such control that a stop can be made if need be.

In May, 1948, the average daily patronage on train No. 11 was 3.1 passengers per train-mile and on train No. 12, it was 1.8 passengers per train-mile. The testimony proves this to have been an average month with about the usual amount of passenger travel. During that month the two trains operated a combined average distance of 294 miles each day, excepting Sundays, and over tweny-five per cent of such daily train-miles were traveled without any passengers. For the entire month the trains were operated 7,664 miles, and for almost half that distance, i. e., 3,776 miles, no passenger, or only one, occupied the train.

For the twenty-month period immediately preceding the hearing before the Commission, i. e., October, 1946, to May, 1948, inclusive, the passenger revenue earned by trains Nos. 11 and 12 was eight cents per train-mile. Their total earnings, which include revenue received from the United States Government for transportation of mail, and other minor service such as carriage of about fourteen ten-gallon cans of milk a week, was twenty-four cents a train-mile. The actual average paid-out cost for operation of the trains for that period was 98 cents a train-mile, thus revealing a loss of seventy-four cents per train-mile operated. The actual revenue loss was $109,229.96, for twenty months, reflecting an average monthly loss of about $5,461.50.

Since 1928, appellee has sustained operating loss of approximately $1,543,000, in operating these trains. This loss includes cost of fuel, car and locomotive repairs,

wages to engine and train crews, and retirement and unemployment taxes on such wages. It does not embrace such items as initial cost of the cars and locomotive, or any proportionate cost of track maintenance, or pay to telegraph operators and other agents along the route. It consists solely of the expenses that will be eliminated if these two trains are not operated.

The testimony discloses that in addition to trains No. 11 and 12, appellee operates two other passenger trains between Richmond and Lynchburg and thence on to Clifton Forge. They are known as Nos. 9 and 10. Train No. 9 leaves Richmond daily at 7:10 o'clock a. m., and arrives in Lynchburg at 12:20 o'clock p. m., and thence proceeds on to Clifton Forge where it arrives at 3:50 o'clock p. m. No. 10 departs from Clifton Forge at 8:35 o'clock a. m., arrives at Lynchburg at 11:30 o'clock a. m., and then proceeds on to Richmond, arriving at 5:05 o'clock p. m.

In addition to this daily passenger service furnished by appellee between Richmond and Lynchburg, the James River Bus Company maintains a bus line which practically parallels the railroad between Richmond and Scottsville, which latter town is about fifty-eight miles distant from Lynchburg. This bus company operates three schedules daily in each direction between Richmond and Dillwyn, which make direct connection at Fork Union for Scottsville. The evidence further shows that there are seven daily buses operated in each direction between Lynchburg and Richmond. Distant from appellee's railroad, yet affording means of travel between Richmond and Lynchburg, are four mail passenger trains run by the Atlantic Coast Line and Norfolk and Western railroads.

The area along and near appellee's road between Scottsville and Lynchburg is rather sparsely populated and the State highways in that immediate territory are secondary roads; yet the passenger travel on the trains between Scottsville and Lynchburg is negligible.

Concern was expressed by appellant and others who appeared in opposition to the discontinuance of these two

trains because of apprehension that inconvenience and delay in the mail service along the railroad would be occasioned if this public service ceased.

The government does not require railroads to transport mail. It is undertaken by the carrier through contract with the government. The testimony amply discloses that whenever local trains that do transport mail are discontinued, the government makes other arrangements for adequate mail collection and delivery and frequently local post offices are afforded improved service. This apprehension of appellant and other parties along the road that the mail facilities will be seriously impaired by removal of this train is shown by the evidence to be unfounded.

The franchise and act of the legislature through which appellee acquired and operates its James River Division declare that it shall maintain a first class railroad along this route equipped with ample accommodations for all passenger travel and freight transportation. This proviso or obligation imposed upon the carrier is, however, relative and subject to the criterion of whether the public convenience and necessity demands the continued operation of these two trains.

Power to determine whether their operation is reasonably necessary to adequately serve the public under the terms of the franchise is conferred upon the State Corporation Commission in the broad police power contained in section 156 (b) of the Constitution of Virginia. That section is, in part, as follows:

"The commission shall have the power and be charged with the duty of supervising, regulating and controlling all transportation and transmission companies doing business in this State, in all matters relating to the performance of their public duties and their charges therefor, and of correcting abuses therein by such companies * * *; and shall require them to establish and maintain all such public service facilities and conveniences as may be reasonable and just * * *."

These powers and duties, along with others conferred

and imposed by this section of the Constitution upon the Commission are carried into effect by section 3716 of the Code. *Norfolk, etc., R. Co.* v. *Commonwealth,* 143 Va. 106, 129 S. E. 324.

The purpose and effect of section 156 of the Constitution is to place all public service corporations under the supervision of the State Corporation Commission. Through that body they are subject to control and regulation. That such regulation and control rest in the Commission is made clear in *Southern R. Co.* v. *Commonwealth,* 128 Va. 176, 105 S. E. 65.

"The power and authority of the Corporation Commission in this State is derived from our Constitution and statutes. The obligations imposed upon the railroad companies, whether by the Constitution and statutes, or by the common law, are all obligations imposed by law. The Corporation Commission was established by the Constitution to visit, supervise, regulate and control these corporations and other corporations doing business in the State, and to that end has been equipped with the necessary authority." (128 Va. at p. 187.)

All duties and obligations of serving the public imposed upon transportation companies by charter, franchise or legislative enactment are now subject to supervision and control of the State Corporation Commission, yet, in the exercise of its powers, the Commission may require that a public carrier establish, maintain and render only such service, facilities and conveniences as are reasonable and just. The duty of this Corporation, under all the facts and circumstances obtaining, is to afford such transportation as is reasonably adequate to meet the public convenience and necessity. That is the legal yardstick by which appellee's duties and obligations must be measured.

The language contained in the Act of 1878-79 imposes no greater burden. If it undertook to do so, it would be subject to and modified by the paramount police power of the State as expressed in section 156 (b) of the Constitution. Thus the obligations upon appellee would ultimately

be measured by the terms of the Constitutional provision. *Portsmouth* v. *Virginia Ry., etc., Co.,* 141 Va. 44, 126 S. E. 366, and *Hampton* v. *Newport News, etc., Elec. Co.,* 144 Va. 29, 131 S. E. 328.

The scope of the powers accorded the Commission not only enables it to require the exercise and maintenance of adequate public service by a public service corporation, but authorizes it to relieve such company of the burden of public service when circumstances justify. Its broad and exclusive power in that respect was recognized and confirmed in *Portsmouth* v. *Virginia Ry., etc., Co., supra.*

"The maintenance of street railway tracks as facilities which are necessary for the performance of public service by a street railway company is obvious. That the State, through the exercise of the police power, may require them to be properly maintained in the public interest must be also conceded. It follows, therefore, that under the sovereign power of regulation, as the company may be required to establish and maintain such facilities, the State, under proper conditions and in order to avoid confiscation, may also decline to require their continuance and permit the abandonment of such facilities if the circumstances justify such action." (141 Va. at p. 51.)

"* * * The Commission is also charged with the duty of requiring them to establish and maintain all such public service, facilities and conveniences as may be reasonable and just, with the power to alter and amend such rules, regulations and requirements from time to time. These powers appear to include the supervision and regulation of every facility the use of which affects the obligations of the transportation company to the public. Then there are the various statutes which have been passed pursuant to the Constitution, which because they have been so often quoted we do not repeat, the manifest purpose of which is to vest the Commission with all of the powers of the State which are necessary to regulate and control such corporations in so far as their duties to serve the public are concerned * * *." (141 Va. at pp. 51, 52.)

"While we have never before had occasion to consider the authority of the Commission to permit the discontinuance of facilities theretofore devoted by transportation companies to the public service, its jurisdiction to grant such permission is based upon the same reasons and supported by the same authorities as the power which is as plainly vested in it to prescribe rates and to require facilities to be maintained. * * *." (141 Va. at pp. 52, 53.)

Of similar import is the decision of *Hampton* v. *Newport News, etc., Elec. Co., supra.*

In our opinion, section 156 of the Constitution, which defines the measure of duty resting upon public service corporations and bestows power upon the Commission to insure the performance thereof, or section 3716 of the Code, which puts into operation these constitutional provisions, do not conflict in any respect with the contractual or franchise obligation contained in the Act of 1878-79. However, if they do, the obligation imposed and resting upon appellee under that Act was with the State and therefore could be and was modified by the constitutional provision and subsequent legislative enactment carrying it into effect. The burdens or obligations imposed upon the carrier by the Act of 1878-79, which is relied upon by appellant, are for the benefit of the public and no individual or community enjoys any special interest or contractual right exclusive of, or paramount to, that of the State.

Section 156 of the Constitution declares "the action of the Commission appealed from shall be regarded as *prima facie* just, reasonable and correct." The weight to be given to the Commission's findings of fact has been often stated. In *Hampton* v. *Newport News, etc., Elec. Co., supra,* we find it recognized and stated thus:

"In *Norfolk, etc., R. Co.* v. *Public Service Comm.,* 82 W. Va. 408, 96 S. E. 62, 8 A. L. R. 155, the court said: 'We will not override the Commission's findings of fact where there is evidence upon which to base them.' " (144 Va. at p. 34.)

To the same effect is *Southern R. Co.* v. *Commonwealth, supra.*

Most pertinent to the facts disclosed in this record and the decision of the Commission thereon is the language used by Judge Harrison in *Norfolk, etc., R. Co.* v. *Interstate R. Co.*, 114 Va. 789, 795, 76 S. E. 940:

"The weight and force to be given the conclusions reached by the Corporation Commission is emphasized by the Constitution, which provides that the action of the Commission shall, on appeal, be regarded as '*prima facie* just, reasonable and correct.' The finding of the commission cannot, however, be disturbed in the case before us, unless the evidence clearly shows that the finding was unwarranted. This it does not do. On the contrary, we are unable to see how the Corporation Commission, could, with due regard to the rights of all parties, including the public, have reached a more just, reasonable and correct conclusion."

The evidence amply sustains the factual finding of the Commission. Summarized, it is to the effect that the operation of these two passenger trains is maintained at an actual average monthly monetary loss of $5,461.50, and that due to other more expeditious and desirable means of transportation, the public is not utilizing the service offered.

Claim that the mail service will be delayed by removal of the trains is not justified. The preponderating evidence is that mail delivery will not be retarded or impaired.

Whether other public facilities are reasonably available, the public need for this service, the use made thereof, and the expense and loss to appellee incurred in its maintenance are controlling factors in determining whether it may be rightfully discontinued. Giving to these elements the weight to which they are entitled, the evidence fully establishes that the order appealed from was correct.

The public simply does not need, use or avail itself of the service offered by these trains and there is no justification for belief that even if the service were improved on this short run, any materially greater use would be made of the two trains sought to be removed.

Conditions, circumstances, means and modes of travel have vastly changed in comparatively recent years. Over a reasonable period of time, the area, communities and needs of the people served by this carrier have been materially affected by these changes. The availability of more and improved highways and the more extensive use of private automobiles and bus transportation have caused marked reduction in the need and demand for short-haul railway passenger service. The public does not now use this service along the route in question to such an extent or degree as to justify its continued rendition at the very considerable loss incurred. Public convenience and necessity in the area served does not require the operation of these two trains at the continued and substantial loss necessarily sustained. To conclude otherwise would approach, if not actually constitute, confiscation of private property for unneeded public service.

The order appealed from is affirmed.

*Affirmed.*