# 𝔚𝔦𝔠𝔥𝔪𝔬𝔫𝔡

## Southern Railway Company v. Commonwealth of Virginia, Et Al.

April 25, 1955.

Record No. 4349.

Present, All the Justices.

The opinion states the case.

*Thomas B. Gay, Lewis F. Powell, Jr., H. Merrill Pasco, Arthur J. Dixon* and *Earl E. Eisenhart, Jr.,* for the appellant.

*J. Lindsay Almond, Jr., Attorney General; C. F. Hicks, Assistant Attorney General* and *William C. Seibert, Commerce Counsel,* for the appellees.

BUCHANAN, J., delivered the opinion of the court.

Southern Railway Company, appellant, an intrastate and interstate common carrier of freight and passengers, filed with the State Corporation Commission on September 16, 1953, a petition for authority to discontinue the operation of its passenger trains No. 7 and No. 14 between Richmond and Danville, in Virginia. Four public hearings were held and evidence introduced before the Commission in December, 1953, and February, 1954, and thereafter on July 21, 1954, the order appealed from was entered holding, for reasons stated in a written opinion by Commissioner King, concurred in by Commissioner Hooker, that public convenience and necessity required the continuance of these two trains and denying the petition. Commissioner Catterall dissented and filed an opinion stating his conclusion to be that the appellant had made a clear case for taking the trains off.

On this appeal Southern contends that the order of the Commission was not reasonable and just as provided by § 156(b) of the Constitution of Virginia and was contrary to the Due Process and Interstate Commerce clauses of the Federal Constitution.

Section 156(b) of the Virginia Constitution makes it the duty of the Commission to supervise, regulate and control all transportation and transmission companies doing business in this State in all matters relating to the performance of their public duties, and to require them to establish

and maintain all such public service, facilities and conveniences "as may be reasonable and just." In the exercise of its powers "the Commission may require that a public carrier establish, maintain and render only such service, facilities and conveniences as are reasonable and just." *Lynchburg Traffic Bureau* v. *Commonwealth*, 189 Va. 612, 619, 54 S. E. (2d) 66, 70.

██ The question now to be answered is whether, in view of all the facts and circumstances disclosed by the evidence, it is reasonable and just to require the appellant to continue to operate these two trains. The testimony, which is not in substantial conflict until it enters the fields of opinion and conclusion, is related in the main to the "controlling criteria" referred to in *Atlantic Coast Line R. Co.* v. *Commonwealth*, 191 Va. 241, 247, 61 S. E. (2d) 5, 7: (1) the character and population of the territory served; (2) the public patronage or lack of it; (3) the facilities remaining; (4) the expense of operation as compared with the revenue from it; and (5) the operations of the carrier as a whole.

The two trains sought to be discontinued are, as stated, No. 7, southbound, which leaves Richmond at 3:15 p.m. and arrives in Danville at 7:10 p.m. daily; and No. 14, northbound, which leaves Danville at 12:50 p.m. and arrives in Richmond at 4:40 p.m. daily. These are known as the day trains, as distinguished from the night trains which the Southern also operates between Richmond and Danville, being No. 11, which leaves Richmond at 10:15 p.m. and arrives in Danville at 2:15 a.m.; and No. 12, which leaves Danville at 4:00 a.m. and arrives in Richmond at 8:00 a.m.

The distance from Richmond to Danville on this branch line is 140 miles. There are 36 stops scheduled for No. 7, seventeen of which are flag stops; and 33 stops for No. 14, twelve of which are flag stops. Each of these trains consists of a diesel locomotive, a mail and express car, a combination baggage and passenger car and a passenger coach; and each

is handled by a crew of six men, consisting of engineer, fireman, conductor, flagman, baggageman and porter.

The operating experience with respect to these two trains was shown in evidence by the General Statistician of the company by way of exhibits supported by a number of schedules showing in detail the operating revenues and operating expenses for the twelve months from October, 1952, through September, 1953, by the month, as well as passenger traffic statistics for the eight years from 1946 through 1953. This witness testified that the Southern, along with other railroads, was required to keep its accounts in accordance with the uniform system of the Interstate Commerce Commission, and to file an annual report with that Commission and with the State Corporation Commission showing passenger operations separately from freight service. His testimony that the schedules used were prepared in accordance with the standard form approved by the National Association of Railroad and Utility Commissioners (NARUC) was not questioned.

Schedule 1 of Exhibit 7 shows that passenger operations on the Southern were at a loss of $10,448,686 for 1950; $14,147,271 for 1951; and $13,366,504 for 1952. Schedule 2 is a composite of the underlying figures shown in detail on twelve other schedules.

Exhibit 8-A, showing the passenger traffic statistics on trains 7 and 14 for the eight-year period of 1946 through 1953, states for each year the average number of passengers per trip and the average passenger revenue per trip, as follows:

| Year | Average number of Passengers Per Trip | Average Passenger Revenue Per Trip |
|---|---|---|
| 1946 | 110.22 | $ 124.31 |
| 1947 | 69.09 | 79.26 |
| 1948 | 52.52 | 66.06 |
| 1949 | 44.04 | 52.14 |
| 1950 | 34.99 | 40.67 |
| 1951 | 32.47 | 39.76 |

| | | |
|---|---|---|
| 1952 | 27.36 | 38.59 |
| 1953 | 22.69 | 33.12 |
| Jan. 1954 | 21.94 | .... * |

* Not available at time of hearing.

From this table, the accuracy of which is not questioned, it appears that from 1946, the first year after the war period, during which railroads generally made a profit on passenger service, there has been a constant decrease in the number of passengers using these two trains until in 1953 the average per trip was little more than one-fifth of the 1946 average, and the passenger revenue per trip had diminished to little more than one-fourth. The average of approximately 23 passengers per trip in 1953 does not, of course, mean that all traveled from Richmond to Danville. Schedules covering the month of September, 1953, show where the passengers handled by No. 7 for that month got on and off. Of 461 who got on at Richmond, 97 rode only a distance of ten or twelve miles. For the twelve months ended September, 1953, the average miles per passenger on the two trains was 56, the average number of passengers on the trains at one time was 9.6, and the average passenger revenue per train mile was 24.91 cents.

These figures deal only with revenue passengers and in that respect it is agreed that they are correct. However, there was evidence that in addition to the revenue passengers transported for the month of September, 1953, train No. 7 hauled 422 non-paying passengers, or "deadheads", and No. 14 hauled 104, presumably officers and employees of the railroad riding on passes. The appellee argues that this personnel would be entitled to reimbursement for travel expenses if they used other means of transportation and that some place should be given to this item in statements of revenue received or expenses saved. There was, of course, no revenue from these sources and the amount saved would be speculative and of doubtful value in an accounting of revenue and expenses.

Schedule 2, above referred to, covered operations of the two trains for the twelve months from October, 1952, through September, 1953, and shows these results:

Revenues ..............................$ 83,906.34
    (Including Passengers $25,460.26; Mail
    $43,909.75; Express $14,118.30)
Expenses ...............................   170,739.60
    (Direct Actual $93,292.12; Direct Appor-
    tioned $77,447.48)
Loss ...................................    86,833.26

These figures show a revenue per train mile of $0.82 as compared to an expense per train mile of $1.67; that is, a cost of $2.04 to earn $1.00.

The expenses are those applicable to passenger service alone, as distinguished from common expense applicable to both freight and passenger operations, such as maintenance of right of way and structures, depreciation, taxes and administrative expenses, none of which is included in the schedule.

The direct actual expenses of $93,292.12 include as major items wages of train crews $64,384.69, payroll taxes $2,-706.24, train fuel $14,550.34 and station employees $10,-522.85. Neither the Commission nor the appellee questions that the payment of these direct actual expenses was made as claimed. It is argued only that there might be a saving in the handling of mail at Richmond; that some other employees might take care of cleaning the Richmond station; that fewer crew members might be employed or a substitute service supplied at less expense. However, railroad management is generally in the hands of persons skilled in that field. It is not to be presumed that they would needlessly lose money year after year if it could reasonably be avoided. No practical basis for reduction of the amounts spent appears in the evidence. As pointed out in *Atlantic Coast Line R. Co.* v. *Commonwealth*, *supra*, a railroad company having no power to fix rates has little control over its revenues, and its control of expenses, particularly wages, is

limited by its employment contracts made with well-organized and nation-wide labor organizations.

In the direct apportioned expenses of $77,447.48, the major items are: Enginehouse expenses $3,208.60, passenger locomotive repairs $21,160.54, passenger train car repairs $23,854.29, CHLW&Ic (cleaning, heating, lighting &c.) $7,301.19, switching trains at Danville $6,337.60, at Richmond $9,479.99. It is explained by the statistician that these apportioned expenses are direct out-of-pocket expenses, the amount of which is estimated on the basis of the company average over the same period for like items. It is obvious that these apportioned expenses are for the most part of a kind necessary to be incurred in the operation of trains. Records of these expenses are not kept with respect to each individual item of equipment, but such records are kept for the whole system and the expense is apportioned to a particular operation on a mileage basis. This is the method approved by the NARUC and Interstate Commerce Commission. Like all estimates, they are subject to error. The question here is whether the apportionment arrives at reasonable amounts.

Appellee's brief says that the Commission did not take the position, and the Commonwealth does not contend, that no part of these apportioned expenses would be saved by the discontinuance of trains 7 and 14, but the Commission felt that not all would be; that the appellant ought to show the expenses of repairs to the particular diesel engines and passenger cars used in these trains. The brief asks whether a similar diesel unit hauling three cars at an average speed of 35 miles per hour will require the same expenditure for repairs as a larger diesel unit pulling more cars at high speed. The only evidence that furnishes an answer is supplied by Southern's diesel supervisor, who testified that the figure of 20.689 cents per unit mile, used in ascertaining the amount fixed for locomotive repairs, was applicable to these trains. He testified that repairs necessary to maintain the locomotive units on these trains were greater than the company

average because the distance between stops being only a few miles, quick acceleration at fast speed and a quick stop were necessary, which required more maintenance and renewal of parts than on the longer runs. Moreover, it was in evidence that an analysis was made of cost increases of labor and material for repairs for the five-year period from 1948 to 1952 to ascertain whether these expenses varied in the same proportion as the number of miles operated, and it was found that the system of maintaining these accounts for repairs showed a variance of less than 10% when tested against actual operating experience.

The Commission thought that the amount of $23,854.29 apportioned to passenger car repairs was not convincing in view of the fact that in 1941 this cost was stated to be $1,966.32 and in 1947 it was $7,713.71. In these two years hearings were had on similar applications to discontinue these two trains. The testimony was that the schedule showing this computation, as well as all other schedules of apportioned direct expenses, was made in accordance with the NARUC standard form. This involved applying the average of that expense per mile for the system, 7.628 cents, to the mileage of these two trains. The statistician testified that to test the accuracy of this result he identified the cars in the pool at Danville used by these two trains and ascertained that these branch line cars received a complete "shopping" approximately every two years, and a record was kept of heavy repairs so made. He obtained the record of these heavy repairs for these cars over a period of four years. He also found from the company records, he testified, that for each dollar spent in heavy repairs $3.30 was spent for running repairs, the repairs required to be made daily in the operation of company trains. The total apportioned to these cars was arrived at by adding to the sum shown by the record to have been spent for heavy repairs the sum for running repairs, ascertained by applying the ratio of running repairs to heavy repairs. It is stated in the appellant's brief that the difference between the 1941 figures and those for

1953 was due to the fact that running repairs were not included in the 1941 figures, plus the fact that the cost of labor and materials more than doubled in the intervening period.

The evidence of the appellant is to the effect that for the year ended September 30, 1953, it operated these two trains at a loss of more than $86,000, or at the rate of 85 cents for each mile of operation. Admittedly the apportioned expense is estimated and could be somewhat less than it is shown, but it cannot be doubted that the yearly loss is substantial and increasing. The Commission states in its opinion that it must be said that the number of passengers has steadily decreased and that there are losses in the operation. It expressed the view that this condition might be improved by providing better equipment and facilities, curtailing expenses and making an effort to attract passengers. Aside from the difficulty of improving service and reducing cost at the same time, the operating experience of the last eight years affords little promise that the suggested remedies would be effective. Rather this experience points to the truth of the observation in *Fleming* v. *Commonwealth*, 191 Va. 288, 296, 61 S. E. (2d) 1, 4, that "Few persons are longer dependent upon public conveyance, and if a railroad company were to provide new, modern and expensive cars and engines the evidence discloses that there would be no appreciable increase in its passenger business."

This branch line is suffering from an illness that has laid hold of all the railroads of the nation. It is called the passenger deficit problem and has been the subject of discussion by, and the cause of concern to, the Interstate Commerce Commission and the State Commissions since it became epidemic after World War II. The National Association of Railroad and Utility Commissioners in 1949 created a committee to make a study of the subject in cooperation with a committee from the Interstate Commerce Commission. This committee reported its conclusions to the Association in 1952, the first one of which was that "The large and continuing deficits incurred by the railroads from

the operation of passenger train service constitute the railroad industry's most serious problem today—a problem which is of paramount importance to the members of this Association and to the general public. * *."

In the *Fleming* case, *supra*, we said: "It is a matter of common knowledge that a revolutionary change has taken place in the field of passenger transportation." 191 Va. at 296, 61 S. E. (2d) at 4.

J. Harvie Wilkinson, Jr., executive vice-president of one of the large banks in Richmond, a member of the Economic Policy Commission of the American Bankers Association, and a member of the Governor's Advisory Council on the Virginia Economy, testified as a witness for the appellant that he regarded the passenger deficit problem as one of the most serious, if not the most serious, of the problems facing the railroad industry, and advanced the opinion that there was not much that could be done about it, "where they are running in a deficit like this."

The existence of an operating deficit does not alone establish the right of the company to discontinue operation of the trains which cause the deficit. That is an important consideration but it is not controlling unless it is so out of proportion to the public convenience and necessity involved in the service as to make it unreasonable and unjust to compel its continuance. In deciding that question the overall financial condition of the railroad may be relevant but is not necessarily persuasive. The appellant concedes that 1952, the year before it filed this application, was a prosperous year and its net earnings were at the rate of 5.31%; but the passenger deficit for that year absorbed 26.9 cents of each dollar of net operating income. It also appears that the company has paid dividends on its common stock for only seventeen of the fifty-seven years of its operation. The loss on the two trains in the present case, although large, would not be disastrous under current conditions. Neither was the loss of $426.86 on the station discontinued in *Atlantic Coast Line R. Co. v. Commonwealth,*

*supra.* Here, as there, the question is whether the loss is out of proportion to the public need of and benefit from the service. *Fleming* v. *Commonwealth, supra,* 191 Va. at 295, 61 S. E. (2d) at 4; *City of Norfolk* v. *Chesapeake & Ohio Ry. Co.,* 192 Va. 828, 836, 67 S. E. (2d) 99, 103.

Relevant to this question, additional to the criteria previously considered, are the character and population of the territory served and the transportation facilities remaining.

The character and population of the territory served are described in the opinion in *Southern Railway Co.* v. *Commonwealth,* 193 Va. 291, 295-6, 68 S. E. (2d) 552, 555-6, affirming the order of the Commission refusing an application of Southern, filed in September, 1950, to discontinue the two night trains, Nos. 11 and 12 referred to above. It may be added to the description there given that this line from Richmond to Danville extends through nine counties having a population of about 220,000 (a population density of only 48.9 per square mile as compared with the State average of 83.2 per square mile); the towns of Burkeville, Keysville, Drakes Branch, Clover and Scottsburg having populations from 695 in Burkeville to 222 in Scottsburg, and South Boston with 6,057.

Our opinion in 193 Va. 291, 68 S. E. (2d) 552, referred to the industrial plants in the area and to the Kerr Dam at Buggs Island as indicating need and promise of patronage for the night trains. It has not turned out that way for these day trains. No representative of any industrial plant and no witness who identified himself as an employee of any industrial plant testified in opposition to the discontinuance of these day trains. The representatives of industry who appeared as witnesses, eight of them, testified that these trains should be discontinued.

Twenty-eight persons appeared as witnesses and objected to the discontinuance. They came from eleven of the thirty-eight stations served by these two trains. Five were from Richmond and none was from Danville. Some of them said they rode these trains regularly, some occasionally

and some not at all. The attitude of people along the line of a railroad toward discontinuing a train is not always based on their need for it. As Commissioner Catterall said in his dissent, "(T)he significant figure is not the number of witnesses who testify, but the number of passengers who ride."

J. Harvie Wilkinson, Jr., the witness for the appellant referred to above, expressed the view that "(T)he elimination of these trains will have no significantly adverse effect on the growth or prosperity of the communities along the line. * * (T)he night trains, Nos. 11 and 12, can provide the service that is needed;" and that there was no real public need for these two day trains; that the public, as distinguished from a few individuals along the line, would not suffer from their discontinuance.

Stuart L. Brown, president of one of the large Danville banks and a member of the Board of Governors of the Federal Reserve System, testified, "My observation has been that these trains are little used by the general public who, for the most part, travel in their own automobiles, or by other modes of transportation. People coming to Danville on business, for example, naturally use their own automobiles rather than wait for the train and then put up with the slow schedule and frequent stops which inhere in local train service. It is my considered judgment that the discontinuance of these trains will not adversely affect the civic and business interests of Danville or its environs."

He further testified that the proposal to discontinue had been carefully considered by the Danville Chamber of Commerce, which did not oppose it. Neither did the Chamber of Commerce of Richmond. The Councils of both of these cities declined to take any action and of the towns only Scottsburg and Drakes Branch formally appeared in opposition. None of the Boards of Supervisors of the nine counties appeared to object. The Boards of Nottoway and Halifax passed resolutions opposing the discontinuance. This contrasts with the opposition of public bodies in the night

train case as stated in 193 Va. at 292, 68 S. E. (2d) at 553-4.

If the day trains are discontinued the remaining facilities of passenger transportation will be trains Nos. 11 and 12, to operate on a changed schedule; busses and private automobiles. An air line operates one flight from Richmond to Danville and two from Danville to Richmond each day. The appellant's division superintendent in charge of the Richmond-Danville line was asked whether he would change the schedule of the two night trains Nos. 11 and 12. He replied, "I want to make that point clear. We are going to change the schedule on the two remaining trains to meet the requirements of the majority of the people served in that territory." Witness Wilkinson, as noted above, testified that these two trains can provide the service that is needed.

The supervisor of Railway Express Company testified that the local express business between Richmond and Danville was of small volume, and that if the day trains were discontinued his company could still give as good service as now exists, and in some cases better service, by handling the express on trains 11 and 12.

The discontinuance of trains 7 and 14 will result in appellant's loss of its mail contract and of the revenue from that source, but according to the evidence it will not work to the disadvantage of that service to the people. The Post Office Department wrote to an officer of the appellant that the schedule of these trains had not been good for mail service, "and if the trains are discontinued, we will supply all offices affected by supplemental star route service, which I believe in many cases will be an improvement on the service." The mail service is the responsibility of the Federal government. *Lynchburg Traffic Bureau* v. *Commonwealth, supra,* 189 Va. at 618, 54 S. E. (2d) at 69.

The evidence shows that a Greyhound bus line operates ten round trips daily between Richmond and Danville, and one round trip daily between Richmond and Burkeville, over U. S. Highway 360 which runs generally parallel to the railroad. For 42 miles of the distance the railroad and

the highway are close together; for the remaining 98 miles the distance between them varies from two or three miles to nine or ten. A map filed in evidence shows there is bus service at various stations on the railroad. A witness for the appellant made a survey of the population at all the railroad stations between Richmond and Danville, including the incorporated towns and persons living within a radius of one mile from the stations in the unincorporated communities. He filed exhibits of the results and testified that of the population of 10,648 served by the railroad 81.2% was served by the Greyhound busses, 8.6% by other bus service and the remaining 10.2%, or 1,086 people, living at 17 of the 38 stations, had no direct bus connection. From other evidence it appears that at several of these 17 stations nobody got on or off either train during the month of September, 1953. At only two did an average of more than one a day get on either train during that month, and at only four did an average of more than one a day get off.

In addition to the remaining train service and the bus service, there is the private automobile, of which it is estimated there is one for every four people in Virginia. In *Fleming* v. *Commonwealth, supra,* the effect of the private passenger car on public transportation was discussed and it was there observed that travel by bus, by automobile and by air had wrought a revolutionary change and that the railroads no longer have a monopoly in the field of transporting passengers. "The local railroad passenger travel largely has been transferred from the railroads to the highways, and this competition has, to a great extent, caused the loss to local passenger business." 191 Va. at 296, 61 S. E. (2d) at 5.

The difference between this case and the case of the night trains which were not allowed to be discontinued (193 Va. 291, 68 S. E. (2d) 552) is one of degree. Here the loss is heavier and the need less. These day trains are carrying fewer passengers. The average number of passengers on them at any one time for the year ended September, 1953, was 9.6. The corresponding average for the

night trains was 17.86. The revenue from passengers here was $25,460 as compared to approximately $53,000 for the night trains. There gross revenues exceeded actual direct expense; here the actual direct expense exceeded gross revenues by some $9,000. The use of the day trains is primarily local; the night trains serve "as feeders to Appellant's main line." 193 Va. at 296, 68 S. E. (2d) at 556.

As observed in the dissent below, "The test of how much a service is needed is how much it is used." While the discontinuance of these two trains will doubtless result in inconvenience to some of the persons who now use them for transportation, it is the convenience and necessity of the public generally which are to be measured against the financial loss of the operation. 191 Va. at 249, 61 S. E. (2d) at 8.

The order of the Commission comes to us as *prima facie* just, reasonable and correct. Va. Const. § 156(b). We must consider its reasonableness and justice in the light of the evidence and the decision of the Commission is not to be disturbed unless it is contrary to the evidence or without evidence to support it. *Atlantic Coast Line R. Co.* v. *Commonwealth, supra,* 191 Va. at 253, 61 S. E. (2d) at 11; *Aetna Insurance Co.* v. *Commonwealth,* 160 Va. 698, 719, 169 S. E. 859, 866.

Here the evidence shows without conflict that the average number of passengers per trip using these two trains has decreased year by year and practically month by month since 1946, until now fewer than ten paying passengers are on them at any one time; passenger revenue per trip is only $33 compared to $124 eight years ago; the passengers who ride pay for their transportation substantially less than half of the amount paid the crew for operating the train; there is approximately two dollars of expense for each dollar received. The limited use made of these trains and the other facilities available for transportation demonstrate that there is no public need for them at all commensurate with the very substantial loss occasioned by their operation.

We are of opinion that the evidence does not support the conclusion that it is reasonable and just to require the appellant to continue the operation of these two trains, but on the contrary that it is unreasonable and unjust under the facts and circumstances shown in the record to make that requirement.

This conclusion makes it unnecessary to discuss appellant's additional assignment that the order of the Commission violates the Due Process and Commerce clauses of the Federal Constitution, other than to say that we think it does not.

The order of the Commission is reversed and the case is remanded with direction to grant the appellant's petition and allow it to discontinue the operation of its trains Nos. 7 and 14.

*Reversed and remanded.*