## Richmond

WASHINGTON AND OLD DOMINION USERS ASSOCIATION, AN UNIN-
CORPORATED ASSOCIATION, ET AL. v. WASHINGTON AND OLD DOMIN-
ION RAILROAD AND COMMONWEALTH OF VIRGINIA, AT THE RELATION
OF THE STATE CORPORATION COMMISSION.

June 12, 1967.

Record No. 6383.

Present, Eggleston, C.J., and Buchanan, Snead, I'Anson, Carrico and Gordon, J.J.

2

*C. Wynne Tolbert; Gerald J. O'Rourke, Jr.* (D.C.) (*David J. Mays,* on brief), for appellants.

*Benson T. Buck; George C. Freeman, Jr.* (*John W. Hanifin, Lewis S. Minter; Hunton, Williams, Gay, Powell & Gibson,* on brief), for appellees.

EGGLESTON, C. J., delivered the opinion of the court.

On February 11, 1965, Washington and Old Dominion Railroad [hereinafter referred to as W&OD] filed with the State Corporation Commission its petition seeking authority to abandon the intrastate operation of its entire line of railroad, extending for a distance of

47.89 miles from the city of Alexandria, through Arlington and Fairfax counties, and terminating at Purcellville in Loudoun county, Virginia. The petitioner alleged that it is a freight line operating entirely within the State of Virginia, and that in 1956, upon the authority of the Interstate Commerce Commission, all of its capital stock had been acquired and is now owned by the Chesapeake and Ohio Railway Company [hereinafter referred to as C&O]. It further alleged that each year since 1959 its operating expenses have greatly exceeded its freight revenues and that public convenience and necessity no longer require the continuing intrastate operation of the line of railroad.

Washington and Old Dominion Users Association, an organization composed largely of businesses which use the railroad, and a single other user opposed the abandonment. Of the three counties traversed by the railroad only Loudoun county opposed the abandonment. The cities of Alexandria and Falls Church and the town of Purcellville took no part in the proceeding. The State of Virginia adopted a neutral position, as did the Department of Highways.

After hearing voluminous evidence, Commissioners Dillon and Hooker inspected the entire line of the railroad. In an opinion by Dillon and concurred in by Hooker, the majority of the Commission held that the prayer of the petition should be granted and the W&OD allowed to abandon intrastate operation of its entire line of railroad. In a dissenting opinion, Commissioner Catterall took the position that the abandonment of the railroad was not in the public interest and should not be permitted. From an order permitting the abandonment, Washington and Old Dominion Users Association and others have appealed.

Before us the main contention of the appellants is that the W&OD failed to carry the burden of showing that the abandonment of its intrastate operation will be in the public interest, that on the contrary the evidence shows that public interest requires the continued operation of the railroad. As a corollary to this proposition, the appellants further contend that because of the relation existing between the W&OD and C&O, the operation should be required to continue, if need be, at the expense of the C&O.

For many years the W&OD's operations have been limited to freight service. In 1964 intrastate freight accounted for 44.9% of its total carload traffic and 43.2% of the total freight revenues. The W&OD owns no rolling stock of any kind except three small loco-

motives, one of which is not in use. It leases from the C&O diesel engines and hopper cars on a per diem rental basis to carry its originated traffic, which is primarily crushed stone and sand.

[1] The evidence is also undisputed that for the five years ending in 1964 a total of $510,891 was spent on maintenance of way and structures. Despite this, the railroad's roadbed, ties, rails and other track facilities are badly deteriorated. The W&OD presented evidence that it will cost more than $2,200,000 to rebuild the existing facilities to a safe and proper condition, and that an additional $2,300,000 must be spent if operating speeds, weight limitations, car-handling capacity and efficiency are to be substantially improved.

The evidence on behalf of W&OD, which the Commission has accepted, shows that the combined interstate and intrastate operations for the years 1960-1964 were conducted at a net loss, ranging from $36,600 to $99,800 for each year. During the same period the intrastate operating revenues dropped from $255,000 in 1960 to $220,000 in 1964.

Only two companies, Arlington Asphalt Company and Sterling Concrete Company, have claimed a continuing need for intrastate service of the railroad. The aggregate amount of traffic handled for these two users in 1964 constituted approximately 97% of its total intrastate traffic. As the majority opinion of the Commission pertinently observed, "With only two principal intrastate shippers, it is obvious that the general public has no concern with whether the railroad does or does not continue to perform this service."

There is also evidence to support the Commission's finding that "there is no reasonable prospect that operations will become profitable in the foreseeable future." The Commission points out that despite the tremendous population growth and physical expansion of the whole Northern Virginia area, the territory, including that served by the railroad, is mainly residential and not industrial, and that the quantity or character of the recurring intrastate freight movements has not improved. During the years 1960-1964 only three new industries located on the railroad and used its facilities, as compared with 22 industries which ceased to use the services during that time. In 1964 only 172 firms or individuals made any use of the railroad's services. Of these only 22 protested its abandonment.

The Commission also found from the evidence adduced that other public facilities are reasonably available to the users of the present railroad.

[2] It is true that the intervenor appellants adduced evidence in contradiction of these critical issues. Their evidence tended to show that from 1960 through 1964 the operation of the railroad was not conducted at a loss but was reasonably profitable. A large portion of their brief before us is devoted to argument in support of that position. But the opinion of the Commission shows that it carefully evaluated the conflicting evidence on this issue of fact and resolved it in favor of the railroad. Similarly, the Commission resolved in favor of the railroad the conflicting evidence on other factual issues, —that the business of the railroad would not appreciably increase in the foreseeable future, that there was no continued public use for the railroad, and that there were other public facilities reasonably available to the users of the railroad should its service be discontinued.

We have repeatedly held that on appeal we will not override the Commission's findings of fact where there is evidence upon which to base them. Such is the situation here. See *Lynchburg Traffic Bureau v. Commonwealth*, 189 Va. 612, 621, 622, 54 S. E. 2d 66, 71; *City of Hampton v. Newport News, etc. Railway, Gas & Electric Co.*, 144 Va. 29, 34, 131 S. E. 328.

[3] Upon consideration of the evidence before it, the Commission held that "the public need for this service, the use made thereof, and the expense and loss incurred by applicant in its maintenance do not justify the continued intrastate freight operations of the W&OD." It further held that to compel the railroad to operate indefinitely at a loss would constitute a deprivation of its property without due process of law. We fully agree with this conclusion. See *Railroad Commission v. Eastern Texas R. R. Co.*, 264 U. S. 79, 85, 44 S. Ct. 247, 68 L. ed. 569; 44 Am. Jur. Railroads § 212, p. 432.

[4] It is argued before us, as it was before the Commission, that the application for the abandonment of the railroad should be denied because witnesses on behalf of the Northern Virginia Transportation Commission had urged that the line should be preserved for future use as part of a rapid transit service in Northern Virginia. The evidence in support of this position is quite vague. It shows that the plan for the creation of such a system is still in the formative stage with no reasonable prospect as to when it will be completed and put into operation.

We agree with the Commission's conclusion that to require the railroad to continue its deficit operation for an indefinite period pending such a possible eventuality would amount to a taking of

its property in violation of the due process clauses of both the Federal and State Constitutions.

[5] The appellants next argue that the W&OD should be regarded as a part of the C&O, the owner of all of its capital stock, and that the C&O should be charged with the financial responsibility for the continued operation of the W&OD. In short, the argument is that the separate corporate entities of the two railroads should be disregarded and the W&OD should be treated as a branch line of the C&O.

The Commission rejected this argument and rightly so, we think. While it is true that the C&O acquired all of the capital stock of the W&OD in 1956, and since that time most of the officers and directors of the W&OD have also been officers and directors of the C&O, the same persons do not hold parallel positions on both railroads in every instance. Moreover, the two companies maintain separate corporate books and separate car and accounting records. They file separate reports with the State Corporation Commission and the Interstate Commerce Commission. The employees of the two companies are not covered by the same labor agreements, that of the W&OD being substantially lower than that of the C&O. The two railroads are not physically connected but interchange traffic only through the Potomac Yard. The traffic on each moves pursuant to its own published tariffs.

The appellants point to certain other transactions between the two companies which, they say, justify disregarding the separate entities of the two and require a denial of the petition for abandonment.

[6-7] In 1962 the W&OD sold to the Commonwealth of Virginia a part of its Rosslyn spur-track line for the sum of $900,000. The proceeds of this sale were paid as a dividend to the C&O, the sole stockholder of the W&OD. The appellants argue that the proceeds of the sale should have been used to curtail the indebtedness of the W&OD to the C&O, or for the repair and rehabilitation of W&OD's line. The dissenting opinion of Commissioner Catterall characterizes the payment of this dividend as unjustified and illegal.

In 1964 the managements of the W&OD and C&O, upon the advice of their accountants, decided that the W&OD should invest an amount equivalent to the $900,000 received from the sale of the Rosslyn branch in other real estate in order to avoid the payment of a considerable capital gains tax. Consequently, the W&OD board authorized the purchase of 2,369 acres of valuable mineral land in

West Virginia for the price of $2,112,500, payable in installments over a two-year period. The W&OD borrowed the funds for the payment of this purchase price from the C&O.

We need not stop to consider whether the use of the proceeds of this sale for the payment of this dividend to the C&O was illegal, as Commissioner Catterall thought it was. The Commission analyzed this transaction and the purchase of the mineral lands and held that they did not constitute a basis for disregarding the corporate entities of the two railroads and were not a valid reason for denying the application for abandonment. It pointed out that in *Beale* v. *Kappa Alpha Order*, 192 Va. 382, 396, 64 S. E. 2d 789, 797, we held that before the corporate entity may be properly disregarded and the parent corporation held liable for the acts of its subsidiary, it must be shown not only that undue domination and control were exercised by the parent over the subsidiary, but also that this control was exercised in such a manner as to defraud and wrong a party dealing with the subsidiary. The Commission further pointed out that there was no allegation of fraud here, and that the appellants had "failed to show that these transactions have resulted in loss or injury to any creditor or user of either railroad."

Moreover, there is no evidence that either of these transactions in any way affected the operating revenues and expenses of the railroad. No part of the operating revenues was used in payment for the West Virginia mineral lands. Nor is there any showing that if the $900,000 had been used for the repair of the line the railroad's business would have been increased. Consequently, we think the Commission correctly held that these transactions were not relevant to whether public convenience and necessity require the continuation or abandonment of the railroad.

Under § 156(f) of the Constitution of Virginia the order of the Commission authorizing the W&OD to abandon the intrastate operation of its entire line comes to us as "prima facie just, reasonable and correct." We have several times pointed out that such an order should not be disturbed on appeal unless it is contrary to the evidence or without evidence to support it. *Southern Railway Co.* v. *Commonwealth*, 196 Va. 1086, 1100, 86 S. E. 2d 839, 847, and cases there cited.

We find that there is ample evidence to support the order appealed from and it is

*Affirmed.*