## 𝕽𝖎𝖈𝖍𝖒𝖔𝖓𝖉

NORFOLK AND WESTERN RAILWAY COMPANY V. COMMON-
WEALTH OF VIRGINIA AND STATE CORPORATION
COMMISSION.

August 28, 1974.

Record No. 731057.

Present, All the Justices.

*Peter J. Hunter, Jr.*, for appellant.

*Hamill Dice Jones, Jr.*, for appellees.

Cochran, J., delivered the opinion of the court.

Norfolk and Western Railway Company filed its application with the State Corporation Commission to modify the Railway's station service at Long Island, in Campbell County, by replacing its present full-time station agent with a mobile agent, who would serve Long Island and several other small stations. The application also proposed to remove the Long Island station building. The Commission denied the application by order entered October 26, 1973, Commissioner Shannon dissenting, and the Railway has appealed, contending that the ruling of the Commission was unjust, unreasonable, contrary to the evidence, confiscatory and thereafter arbitrary and contrary to law.

Long Island is a small agricultural community with a population of fewer than 100. The station agent at Long Island is employed for five 8-hour work days each week. In 1973 the Railway, with his knowledge, made two time studies of his activities. On May 15, 1973, the agent engaged in 40 minutes of

patron work and 59 minutes of other work for the railway, and had 381 minutes of idle time. On June 29, 1973, the agent's activities comprised 31 minutes of patron work, 23 minutes of other Railway work, and 416 minutes of idle time. There was testimony that the agent's Railway work other than serving patrons, including such tasks as sweeping out the station and walking to the post office, was non-essential and would be discontinued if the station were removed. Even if all non-essential work is counted, however, the evidence shows that the station agent has approximately 6-1/2 to 7 hours of idle time in each 8-hour work day.

The uncontradicted evidence, introduced through testimony of F. X. Burkhart, the Railway's Regional Superintendent of Stations, is that the station cost of maintaining the Long Island agency, consisting mostly of the agent's salary and fringe benefits, was $10,425.27 for 1971 and $11,740.21 for 1972. Gross revenues from the station were $36,924.11 in 1971 and $38,682.70 in 1972. The Railway's principal patron at Long Island is Chesapeake Corporation, which accounted for 457 of the 474 cars handled in 1971 and for 372 of the 377 cars handled in 1972. In 1972, 79% (299 cars) of the traffic at the Long Island station consisted of shipments of pulpwood to the Chesapeake Corporation's plant at West Point, Virginia, via an interchange with the Southern Railway at Burkeville.

Burkhart testified that the Railway now has a mobile agent stationed at Brookneal, about 12 highway miles east of Long Island, who serves stations at Aspen, Phenix and Cullen, all east of Brookneal. The agent each day goes to the shippers' places of business, determines their needs, prepares bills of lading, inspects damage and issues instructions to train crews. In addition to the daily personal service of the mobile agent, toll-free telephone communication with him is made available to patrons.

In 1973 the Railway made two time studies of the mobile agent's activities. On May 16, 1973, he spent 149 minutes on mobile agency duties, worked for 15 minutes assisting the Railway's full-time station agent at Brookneal, and had 316 minutes of idle time in the 8-hour work day. On July 3, 1973, the mobile agent spent 141 minutes on mobile agency duties, 29 minutes assisting the agent at Brookneal, and had 310 minutes of idle time. The addition of Long Island to the mobile agent's

territory would increase the total mileage to be covered by him each day to only 82 miles, less than the mileage covered in other existing mobile agencies. The mobile agent's idle time of approximately five hours each day would be more than sufficient to enable him to serve Long Island.

Burkhart further testified that the mobile agency concept works well and is preferred by shippers and that Long Island is particularly adaptable to mobile agency service because the agent at Long Island "has no duties with respect to loading" outbound cars of pulpwood. The cars are weighed, the rate is figured and the freight charges are collected at destination, so that little agency service is required at Long Island.

Burkhart also testified that if the Railway were permitted to replace the Long Island agent with a mobile agent operating from Brookneal, the change would not violate the Railway's union contract, and the present Long Island agent, because of seniority, would be entitled to fill the position of mobile agent at an increase in salary. Burkhart estimated that the proposed modification of service would enable the Railway to save almost the amount of the station cost of maintaining the Long Island agency.

N. F. Weber, the Railway's Assistant Manager-Costs, testified that in 1972 the variable cost of hauling pulpwood from Long Island to West Point, which accounted for 79% of the total traffic of Long Island, exceeded revenue by $13.83 per car.[1] The cost of maintaining a full-time agent at Long Island was $31.14 per car, contrasted with the Railway's average cost for station clerical expense of $7.83 per car. He estimated that if the full-time agent were replaced by a mobile agent, there would be a profit per car, although he did not know the per car cost of the proposed mobile agency. Based upon the average station clerical cost of $7.83 per car the profit would be $23.31 per car.

---

[1] Weber's variable cost figures were based not only upon the actual cost of running trains to haul pulpwood from Long Island to West Point, including such costs as wages of train crews, switching costs at Long Island, and interchange costs at Burkeville, but also upon track maintenance and the station cost of maintaining the Long Island full-time agency, costs which might more accurately be described as fixed expenses. Weber's cost analysis was not based upon an allocation of systemwide costs to the Long Island station but was derived from actual costs applicable solely to the Long Island-West Point traffic. Moreover, Weber testified that fully allocated costs would have exceeded revenues at Long Island by "an even greater margin."

Two witnesses testified in opposition to the Railway's application. Ray Wood, brother of the Long Island station agent, testified that, although not employed by Chesapeake Corporation, he was a dealer in pulpwood for that company at Long Island. He bought pulpwood from many woodcutters who brought their logs to the Chesapeake Corporation yard at Long Island. The Chesapeake Corporation yard manager, however, rather than Wood, arranged with the station agent for cars, preparation of shipping documents and other Railway services.

Wood also testified that he had previously been the dealer for Chesapeake Corporation at Aspen but that after the station agent at Aspen had been replaced by the mobile agent, business had slowed down, Wood's representative had quit and Wood had discontinued operating there. Wood's testimony provided no connection between the decline in his business at Aspen and the institution of mobile agency service at that station.

The record shows that in 1972 Wood's use of rail service at Long Island comprised three carloads of lime received by him. Another Long Island customer received two carloads of potash, and the remaining freight handled at Long Island during the year consisted of 372 outbound carloads of pulpwood shipped by Chesapeake Corporation.

The other witness in opposition, Russell R. Simpson, a farmer who lived in Pittsylvania County five miles from Long Island, had not shipped by rail for several years. He testified to efforts that he and others in the area had made to encourage industrial development, which he felt would be seriously impeded if the full-time station agent at Long Island were replaced. He conceded that he had made the same argument in opposition to three earlier Railway applications to discontinue service and that the desired industrial development had never materialized. Simpson testified that the Long Island station agent was helpful to him by flagging trains to permit Simpson's cattle to cross the Railway tracks in safety. Simpson also used the opportunity afforded him at the hearing to express his displeasure at the Railway's manner of handling his claims for cattle killed by trains.

Resolutions passed by the Boards of Supervisors of Pittsylvania and Campbell Counties, and a petition signed by 51 residents of the Long Island community, all opposing the Railway's application, were filed with the Commission during the hearing.

The decision of the Commission is, of course, presumed to be correct, and a determination made by the Commission, based upon application of correct principles of law, will not be disturbed unless it is contrary to the evidence or without evidence to support it. *Farmers and Merchants* v. *Commonwealth,* 213 Va. 401, 404-05, 192 S.E.2d 744, 747 (1972).

The Commission may require a railroad to render only such service as is "reasonable and just." *So. Ry. Co.* v. *Commonwealth,* 196 Va. 1086, 86 S.E.2d 839 (1955); *Atlantic Coast Line R. Co.* v. *Com.,* 191 Va. 241, 61 S.E.2d 5 (1950).

There is no fixed formula for determining what amount of service is "reasonable and just." *Southern Ry. Co.* v. *Commonwealth,* 193 Va. 291, 296, 68 S.E.2d 552, 556 (1952). In a proper case the Commission may require a railroad to furnish services at a loss where reduction of such services would be contrary to the public convenience and necessity. *See Southern Ry. Co.* v. *Commonwealth, supra.* The decision in such cases depends upon whether the public interest in maintaining the service outweighs the railroad's losses. The controlling criteria are as follows:

"(1) the character and population of the territory served; (2) the public patronage or lack of it; (3) the facilities remaining; (4) the expense of operation as compared with the revenue from it; and (5) the operations of the carrier as a whole." *So. Ry. Co.* v. *Commonwealth, supra,* 196 Va. at 1088, 86 S.E.2d at 841; *Atlantic Coast Line R. Co.* v. *Com., supra,* 191 Va. at 247, 61 S.E.2d at 7.

When these criteria, particularly the first three, are considered in the present case, the decision of the Commission is not supported by the record. The majority opinion concluded that the Railway failed to furnish "sufficient evidence to prove that Long Island can be included in the Brookneal mobile agency without creating a deterioration in service to the public." We do not agree.

There is nothing in the record to support a conclusion that there would be any deterioration in service except for a reduction in the number of hours that the Railway agent would be present in person at Long Island. There is no evidence that the rail service, after the proposed change, would not be reasonable and just. Indeed, the evidence is to the contrary.

The Commission, as noted in the majority opinion, has

previously approved the concept of mobile agency service in *SCC Case No. L-413.* Accordingly, the inevitable reduction in the time that an agent would be personally present if mobile agency service were initiated is not of itself sufficient to sustain a determination that the proposed mobile agency service would not be reasonable and just. The record is devoid of any other evidence to support the Commission's decision.

The testimony of Ray Wood, the only Long Island patron who objected to the proposed modification of service, was that his brother, the station agent, was helpful to him in obtaining rack cars to haul pulpwood. Yet Wood, who shipped no outbound freight by rail in 1972, conceded that all arrangements for shipping Chesapeake Corporation pulpwood were made by the Long Island yard manager of that corporation. The record shows that the proposed mobile agency service would cause neither Wood nor Simpson, the other witness who testified in opposition to the application, to suffer any inconvenience of which they might properly complain.

There was evidence of opposition by local citizens and governing bodies, as the majority opinion noted. The general public, however, has little concern in a case where termination or modification of rail service would affect only one principal patron. *See Users Association* v. *W & O D Railroad,* 208 Va. 1, 4, 155 S.E.2d 322, 324 (1967). And the power and duty of the Commission to require railroads to maintain reasonable and just facilities and conveniences are not conditioned upon the objection or lack of objection that may be evidenced. *Penn R. Co.* v. *Commonwealth,* 195 Va. 538, 543, 79 S.E.2d 607, 609 (1954). Nevertheless, while not controlling, the failure of the Chesapeake Corporation to object is a fact to be considered.

The majority opinion questioned the viability of the mobile agency on the ground that the mobile agent at Brookneal would have insufficient time to assume new duties at Long Island. This conclusion, based on the assumption that the Railway "did not furnish . . . any studies to show what amount of time during the mobile agency's five hour idle time was spent assisting the [regular] Brookneal agent . . .", is contrary to the un-contradicted evidence. The record shows that, on the days on which time studies were made, the time spent by the mobile agent in assisting the Brookneal agent was included as Railway work before computing the mobile agent's idle time of more than

five hours each day. The majority incorrectly found that the Railway had produced insufficient evidence to show that the mobile agency would result in savings to the Railway. The Railway's witness Weber testified that the mobile agency would eliminate losses at Long Island and make the agency profitable. Although he could not testify to the exact amount of savings, he estimated that it would be approximately the cost of maintaining the full-time Long Island agency, less the mobile agent's travel expenses to Long Island. The Commission's ruling that this uncontradicted testimony was insufficient is untenable.

The Commission, comparing gross revenues at Long Island with station expense alone, concluded that the agency was "a prosperous one indeed", and that the Railway's application could not be sustained on economic grounds. The Commission's calculations excluded all of the Railway's other operating costs attributable to hauling pulpwood from Long Island to West Point. Weber testified that if these costs were included, the Railway lost $13.33 per car on the Long Island-West Point traffic in 1972. The Commission correctly points out that, as the Railway's proposal would not terminate or reduce train service at Long Island, the costs other than station expense would remain the same. But it does not follow that these costs cannot be considered in this proceeding. While the application of an arbitrary "rule of thumb" in comparing costs to revenues is unacceptable, *Penn R. Co.* v. *Commonwealth, supra,* 195 Va. at 541, 79 S.E.2d at 609, a railroad should be permitted to use recognized and standard accounting procedures in determining the cost of a particular operation.

Other jurisdictions have approved cost calculations based on formulae which allocate to each station a portion of systemwide expenses. *See St. Louis-San Francisco Railway Company* v. *State,* 515 P.2d 233, 235 (Okla. 1973); *City of Caraway* v. *Arkansas Commerce Commission,* 453 S.W.2d 722, 727 (Ark. 1970); and *New Orleans & N.E.R. Co.* v. *Town of Heidelberg,* 194 So.2d 866, 867 (Miss. 1967). These decisions have thus permitted railroads to present evidence of costs beyond that with which we are here concerned, for the Railway's evidence was limited to the actual costs peculiar to the single station affected by its application.

The Commission should have considered all the Railway's evidence of costs in determining the loss or profit of maintaining

the Long Island station. Although the public convenience and necessity may outweigh a carrier's costs in proceedings such as these, the carrier is entitled to have all actual costs considered. In this case, however, the cost of maintaining the agency is not dispositive.

The record shows that the Railway, in effect, is being required to maintain a full-time station agent in idleness at Long Island for the benefit of a single shipper whose use of rail service would be unaffected by replacement of the local agency by a mobile agency. At the same time the Railway maintains a mobile agent in Brookneal whose duties require less than half his working hours, who can easily service the Railway's patrons at Long Island. By eliminating one of these positions, the Railway will effect substantial savings with a modification of rail service having a minimal impact, if any, on the public convenience and necessity. To deny the Railway's application in this proceeding would require denial of future applications for mobile agency service whenever there is any opposition, and the gross revenues of the station agency exceed direct station costs. We believe that this would impose on railroads an unduly harsh and inflexible standard. Mobile agency service should be encouraged in order to promote efficiency in rail carrier operations where, as here, the record shows that the public convenience and necessity will be reasonably met by such service.

The majority decision in this case is contrary to the evidence and without evidence to support it. Accordingly, the order of the Commission is reversed and the case remanded.

*Reversed and remanded.*